Peter Conroy ROBINSON, Plaintiff,

v.

**JARDINE INSURANCE BROKERS INTERNATIONAL LIMITED,**
Defendant.

No. C–94–1255 SAW.

United States District Court,
N.D. California.

June 23, 1994.

Shand. S. Stephens, Margaret L. Parker, Laurie Falik, San Francisco, CA, for plaintiff.

Maureen E. McClain, Charlotte Addington, A. Roger Jeanson, Kauff, McClain & McGuire, San Francisco, CA, for defendant.

### MEMORANDUM AND ORDER

WEIGEL, District Judge.

## I. BACKGROUND.

Defendant Jardine Insurance Brokers International Limited ("Defendant") is an English corporation that deals primarily with specialists, agents and other brokers on the wholesale side of the insurance business. Defendant is part of the Jardine Group, a

number of associated entities in the insurance business.

Peter Robinson ("Plaintiff"), a California citizen, was first employed by the Jardine Group in 1983, when he joined a California company called Jardine Emmet & Chandler San Francisco Inc. Insurance Brokers. In January, 1987, Plaintiff moved to London to manage Glanvill Enthovin North America Limited ("GENA"), a North American division of Defendant.[1] Plaintiff became a director of GENA in January, 1987, and a director of Defendant in January, 1988.

In July, 1991, Defendant set up an Accident and Health Division in the United Kingdom.[2] Plaintiff was appointed Managing Director of the Division, and in that capacity he reported to Michael Gribbin ("Gribbin"), Defendant's Chairman and Chief Executive Officer. In 1992, the Division's Board of Directors decided to set up an Accident and Health Division in San Francisco, and Plaintiff was given responsibility for establishing and managing the new Division.

The parties dispute Plaintiff's employment status once he became Managing Director of JIB International Accident and Health, Inc. ("JIB A & H"), the Accident and Health Division in San Francisco. According to Plaintiff, he resigned his directorate position with Defendant effective June 15, 1992. Plaintiff claims his resignation is reflected in Defendant's annual report, and in his receipt of "holiday pay," which Gribbin acknowledges is awarded only upon termination of employment. Plaintiff contends that he was thereafter employed directly by JIB A & H, a California corporation which is wholly owned by HG Holdings, a Pennsylvania corporation.[3]

Defendant argues that Plaintiff remained an employee of Defendant even after he relocated to the United States. Defendant bases its argument on the premise that the San Francisco and London offices acted as a single entity, with Plaintiff still reporting to Gribbin, and London employees still reporting to Plaintiff.[4] Defendant emphasizes that it directly or indirectly paid the operating expenses of JIB A & H until December, 1993.[5] Defendant also points to several alleged admissions by Plaintiff that he remained an employee of Defendant.[6]

On March 25, 1994, during a trip to London, Plaintiff informed Gribbin that he was resigning.[7] Since Plaintiff's resignation,

---

1. Defendant was at that time called "Jardine Glanvill Limited."

2. The Division was a joint venture with Jardine Thompson Graham Ltd. Defendant reportedly owned 67% of, and had control over, the Division. The Division was not incorporated as a separate entity, but was run by an informal Board of Directors which included Plaintiff and Michael Gribbin, Defendant's Chairman and Chief Executive Officer. Evelegh Decl., ¶ 2.

3. On this point, Defendant counters that the only reason JIB Accident & Health was incorporated in California was for organizational and tax efficiency. Evelegh Decl., ¶ 4.

4. Defendant also claims that income and expenses in the United States and London were included in a single Accident and Health Division budget. Robinson Depo., 85, 114, 115, Exh. 37.

5. The June 1992 payroll for JIB Accident & Health in San Francisco was paid directly by Defendant. Stimmel Decl. at 2. Then, after JIB Accident & Health was incorporated in California, a Jardine affiliate company called IISI advanced operating costs, including Plaintiff's salary, to JIB A & H. *Id.* IISI was in turn reimbursed by Defendant. *Id.* This arrangement

continued until December, 1993, when JIB A & H began receiving sufficient premium payments to cover salary and other operating costs. *Id.* Plaintiff stresses that Gribbin considers himself an employee of the JIB Group even though his salary is paid by Defendant. Gribbin Depo. at 53–54.

6. For example, in a May 18, 1992 letter, Plaintiff stated "I will be living out of the country although still employed by Defendant;" in a December 7, 1992 letter, Plaintiff wrote "[w]e operate the office here as an office of the Accident and Health Division and as a division of Defendant. The legal incorporation through Defendant's U.S. holding company—H.G. Holdings— was done for tax and licensing simplicity;" and in a written proposal to the Daughters of Charity which Plaintiff compiled in February, 1994, he included a document describing his business history as "1991–Present Jardine Insurance Brokers International Limited Managing Director of Accident and Health Division." Evelegh Decl., Exhs. 1, 4, 2.

7. At Gribbin's request, Plaintiff sent a letter of resignation to Gribbin, which was dated March 25, 1994, and received on April 5, 1994. Gribbin Decl. ¶ 9.

three other employees of Defendant have apparently resigned in order to accept positions with Plaintiff's new employer, AON Group ("AON").[8] Defendant alleges that Plaintiff approached these three employees, as well as two others who have not yet resigned,[9] in order to induce them to follow Plaintiff to AON. Defendant also claims that Plaintiff contacted at least one of Defendant's clients regarding transfer of its business to AON.

Plaintiff denies that he has solicited any of his former colleagues or clients at Defendant and maintains that he is not bound by any contractual non-compete provisions. Plaintiff claims that before he began work for Defendant in London, he was presented with a letter which set forth the proposed terms and conditions of his employment, including salary, projected bonuses, car and living allowances, and relocation expenses. Gribbin acknowledges that the letter, which contains no non-compete provisions, constituted an offer of employment, which Plaintiff accepted.

Eighteen months later, in June, 1988, Plaintiff was presented with a proposed employment contract containing post-employment restrictions, and he refused to sign it.[10] Plaintiff was subsequently given an "annexure" to the non-compete provisions of the unsigned contract, which he also refused to sign.[11] At a later date, Plaintiff was presented with an "annexure" reducing his age of retirement from 62 to 60, which he signed on November 28, 1990. The annexure referred to a "contract of employment," which Plaintiff believed to be the offer letter he accepted in 1987. Robinson Depo., 44–50.

On April 12, 1994, Defendant obtained an ex parte Temporary Restraining Order ("English Order") from the High Court of Justice in London, prohibiting Plaintiff from soliciting former colleagues to leave Defendant, and prohibiting Plaintiff from doing business with Defendant's clients.[12] On April 13, 1994, this Court issued a TRO enjoining Defendant from "enforcing or attempting in any way to enforce in the United States the ex parte order" issued by the English Court. On the night of April 13, 1994, agents of Defendant attempted to serve upon Plaintiff, at his residence in California, a copy of the English Order and Summons.[13]

On April 14, 1994, Plaintiff applied to this Court for an Order to Show Cause re Contempt ("OSC"), arguing that Defendant had violated this Court's TRO by serving the English Order and Summons on Plaintiff. This Court issued an OSC, and on May 3, 1994, after two hearings, decided not to hold

---

8. The employees who have already left Defendant are Christopher Mays, James Staniland, and Patrick Carter.

9. The two employees who have not yet resigned are Mark Titmuss and Kevin Steel.

10. The alleged contract provides that an executive employee shall not, for a period of twelve months following employment, seek to procure orders from, or do business with, former or prospective clients of Defendant; or knowingly offer employment to or offer to contract for services with, any senior employee of Defendant. Defendant acknowledges, however, that neither Plaintiff nor Defendant ever signed the proposed contract. Gribbin Decl., Exhs. 1, 2.

11. Gribbin testified at deposition that the unsigned contract was not a condition of Plaintiff's employment. Moreover, on February 17, 1993, Gribbin sent Plaintiff a letter stating: "I take it that by now you will have spoken to Lew Gold regarding the drafting of a suitable contract of employment for you." Plaintiff argues that this letter confirms that even Gribbin did not believe that Plaintiff was bound by the unsigned contract

of employment which was delivered to Plaintiff in June, 1988.

12. The English Order provides that Plaintiff is restrained from "(i) soliciting or attempting to solicit any employee of Jardine Insurance Brokers International Limited ("JIBIL") to leave the employment of that company and/or to enter into a contract of service or services with AON Corporation or any other company, firm or individual; and/or (ii) directly or indirectly seeking to procure orders from or doing business with any person, firm or company who at any time during the twelve months preceding the cessation of the defendant's employment with the plaintiff was a client of JIBIL for the placement or renewal of insurance or reinsurance contracts where JIBIL placed, offered, or administered the identical or similar contracts." TRO Application, Exh. 4.

13. Plaintiff was not home at the time, and his wife refused to open the door, so the process server left the documents on the door step. Defendant has since stipulated that this attempt at service was ineffective in the English action. Transcript of 5–3–94 Hearing, Addington Decl., Exh. C.

Defendant or its attorneys in contempt. Also on May 3, the Court modified the TRO by striking the notation "in the United States," so that the prohibition against enforcing the English Order no longer has a territorial limitation.

Plaintiff's Application for Preliminary Injunction is now before the Court.

## II. DISCUSSION.

### A. Standard for Granting Preliminary Injunction.

■ The standard for issuing a preliminary injunction is settled. The moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of the hardships tips sharply in his favor. *California Cedar Prods. Co. v. Pine Mountain Corp.*, 724 F.2d 827, 830 (9th Cir.1984).

### 1. Likelihood of Success.

■ a. *Existence of Contract.* Plaintiff argues that he cannot be held to the terms of the contract because the contract was never executed.

It is undisputed that neither Plaintiff nor Defendant ever signed the employment contract containing the non-compete provisions which Defendant is attempting to enforce in the English action. It is also undisputed that Plaintiff never signed the annexure to the non-compete provisions of the unsigned employment contract. Plaintiff did sign an annexure to his "employment contract" which lowered his retirement age from 62 to 60. But, that annexure did not specifically identify the unsigned employment contract which Defendant is attempting to enforce, and Plaintiff has testified that he believed that "employment contract" referred to the original offer letter, the terms of which he accepted before beginning work in England in 1987.

Defendant has set forth no legal basis for enforcing the non-compete provisions of a contract which Plaintiff never signed, and which Defendant's Chief Executive Officer testified was not a condition of Plaintiff's employment.[14]

b. *Validity of Contract.* Plaintiff alternatively argues that even if he could otherwise be bound by the terms of the contract, the contract is invalid under California public policy.

■ As a general proposition, an individual has a right to freely pursue the livelihood of his or her choice. *Futurecraft Corp. v. Clary Corp.*, 205 Cal.App.2d 279, 285–86, 23 Cal.Rptr. 198 (1962). California Business and Professions Code § 16600 provides that any contract "by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void." Cal.Bus. & Prof.Code § 16600. This statute has been found to represent a strong public policy of the state, and contains only two exceptions, neither of which applies to the instant controversy.[15]

■ Although a person is generally free to compete with his former employer, there are limits on that freedom. For example, an employer may under certain circumstances contractually prohibit an employee from soliciting its clients or raiding its workforce for a limited period of time following termination of employment.[16] *See Moss, Adams & Co. v.*

---

14. Plaintiff also argues that even if he could have been held to the contract at one time, the contract terminated by its own terms before March, 1994. Plaintiff contends that he was no longer an employee of Defendant as of June, 1992, so that the twelve-month post-employment restrictions expired by June, 1993. However, as discussed above, Plaintiff's employment status after relocating to the United States is a subject of dispute between the parties, and Plaintiff has not met the standard for a preliminary injunction on this point.

15. The two exceptions are: where the party sought to be restrained has sold a business to, or has been in a partnership with, the party seeking the restraint. *Scott v. Snelling & Snelling*, 732 F.Supp. 1034, 1042 (N.D.Cal.1990); Cal. Bus. & 06 Prof.Code §§ 16601, 16602.

16. Even in the absence of a contract, an employee may not use a former employer's trade secrets to solicit clients. *See Moss, Adams*, 179 Cal. App.3d at 128, 224 Cal.Rptr. 456. A customer list is a trade secret if it contains information that is valuable because it is unknown to others

*Schilling,* 179 Cal.App.3d 124, 224 Cal.Rptr. 456 (1986); *Loral Corp. v. Moyes,* 174 Cal. App.3d 268, 219 Cal.Rptr. 836 (1985).

 Here, the alleged employment contract and the English Order based thereon, purport to prohibit Plaintiff from doing any business with Defendant's clients, regardless of who initiates contact. Plaintiff has demonstrated a probability of succeeding on the claim that such a restriction is invalid under § 16600.[17]

## 2. Balance of Hardships.

Plaintiff claims that he will suffer immediate and irreparable injury if a preliminary injunction does not issue because he will be prevented from pursuing his livelihood by competing freely in the insurance business.[18] In particular, his ability to serve clients who choose to transfer their business to AON would be interrupted, causing loss or damage to those client relationships.[19]

 Defendant counters that if a preliminary injunction is issued, Defendant will suffer the greater injury because it will lose employees and clients to AON, and Plaintiff will continue to disclose trade secrets to AON for the purposes of soliciting Defendant's clients. However, Defendant's statements are merely conclusory. Defendant has not even attempted to identify a legally protected trade secret, or a basis for protecting that trade secret. Moreover, Defendant has failed to explain how the potential loss of a few clients and employees to a company of its size outweighs the hardship to an individual employee in Plaintiff's position.[20]

In light of the foregoing, Plaintiff has shown a possibility of immediate and irreparable harm, which outweighs the risk of harm to Defendant.

## 3. Comity.

Defendant concedes that this Court may properly and fairly enjoin enforcement of the English Order in the United States.[21] The primary issue before the Court, therefore, is whether Defendant should be enjoined from enforcing the English Order in England.

 As a general principle, one court will not interfere with or try to restrain

---

and the owner of the list has attempted to keep it secret. *ACIC v. Sacks,* 213 Cal.App.3d 622, 630, 262 Cal.Rptr. 92. For example, in *Sacks,* a customer list for a company selling credit insurance was a trade secret where only 6.5% of the projected customer base had purchased the product, and the employer had taken steps to keep information about those customers from competitors. An employee need not have signed a confidentiality agreement in order for information to be considered secret. *See Courtesy Temporary Service, Inc. v. Camacho,* 222 Cal.App.3d 1278, 1288, 272 Cal.Rptr. 352 (1990).

Here, Defendant attempts via the English Order to prohibit Plaintiff from doing any business with Defendant's clients, not just soliciting Defendant's clients. Moreover, Defendant has not identified any trade secrets that are threatened by Plaintiff, or any basis for protecting those trade secrets. Accordingly, in the absence of a contract, the law of trade secrets and unfair competition would not provide a basis for the restriction Defendant seeks.

**17.** Section 16600 provides that contracts that unduly restrict competition are "to that extent void," and the alleged employment contract contains a severability clause. However, the English Order itself cannot be appropriately severed. Accordingly, enforcement of the English Order in its entirety is prohibited in the United States, and

any necessary restriction on Plaintiff's conduct may be secured through an appeal to this Court.

**18.** Plaintiff also claims that if the Court does not enjoin enforcement of the English TRO in the United States and England, Defendant will serve Plaintiff with the English TRO. Once Plaintiff has been served, he will be forced to defend the action in England at great expense or face contempt penalties including imprisonment. This factor is discussed in the section on comity, *infra.*

**19.** Plaintiff has testified that at least one client has already requested to transfer business to Plaintiff's new firm, AON Group.

**20.** In calculating respective hardships, a court must consider the impact of the proposed preliminary injunction on both parties. The size and strength of each party may be a relevant factor in this determination. *Sardi's Restaurant Corp. v. Sardie,* 755 F.2d 719, 726 (9th Cir.1985). Defendant has annual revenues of nearly $8 billion, and employs over 140,000 people.

**21.** "This Court struck a proper balance at this stage of the proceedings in its April 13 TRO by permitting JIBIL to proceed to enforce its rights and protect its interests in England, under English law, while at the same time enjoining enforcement of the English Order against Plaintiff in the United States." Opposition Brief at 22.

proceedings in another court in an ordinary action in personam. *Compagnie Des Bauxites De Guinea v. INS Co. of North America*, 651 F.2d 877, 887 (3d Cir.1981) (citing *Donovan v. City of Dallas*, 377 U.S. 408, 412, 84 S.Ct. 1579, 1582, 12 L.Ed.2d 409 (1964)). Where judgment is sought in personam, two courts with concurrent jurisdiction may proceed with litigation at least until judgment is obtained in one case which may be used as res judicata in the other. *Id.* (citing *Princess Lida v. Thompson*, 305 U.S. 456, 466, 59 S.Ct. 275, 280–81, 83 L.Ed. 285 (1939)). This principle applies even where one action is foreign. *Id.*

■■■ Nevertheless, a district court with jurisdiction over the parties has "the power to enjoin them from proceeding with an action in the courts of a foreign country, although the power should be 'used sparingly.'" *Seattle Totems, et al. v. National Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981). The issue is not one of jurisdiction, but of comity. *Id.* The fact that an anti-suit injunction is aimed at the parties to a foreign suit rather than the court itself does not alter the analysis. *China Trade and Development v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir.1987) (citing *Peck v. Jenness*, 7 How. 612, 48 U.S. 612, 12 L.Ed. 841 (1849)).

In the Ninth Circuit, foreign litigation may be enjoined where it would "(1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's [sic] in rem or quasi in rem jurisdiction, or (4) where the proceedings prejudice other equitable considerations." *Seattle Totems*, 652 F.2d at 855.[22] As the Ninth Circuit has expressly noted, *Seattle Totems* stands for the proposition that later-

filed foreign actions may in certain cases be enjoined.[23] *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.1986).

■■■ a. *Policy of the Forum.* Plaintiff claims that the English action frustrates California's public policy against unreasonable restrictions on lawful competition.

While enforcement of the English Order in the United States may undermine California public policy, enforcement of the English Order in England presents no such conflict. Plaintiff was admittedly an employee of a British corporation in London at the time he allegedly entered into the non-compete provisions.[24] He may therefore be subject to an English court's determination of his future rights to engage in business in England without offending California public policy.

b. *Vexatiousness of Foreign Litigation.* Plaintiff complains that being forced to defend against the English action in England is vexatious.

However, the English action was filed first. So, if Plaintiff was concerned about the prospect of pursuing two actions simultaneously, he could have appeared in the English action rather than initiating a second suit here. Moreover, equity does not favor relieving Plaintiff of his duty to defend against the English action in England. Plaintiff claims that an injunction prohibiting enforcement of the English Order in the United States only is inadequate because he travels frequently to England to conduct his business. At the same time, Plaintiff claims that it is vexatious to require him to defend against a suit brought by his former English employer in England. Plaintiff cannot have it both ways. If he intends to conduct business in England,

---

**22.** In *Seattle Totems,* a United States citizen filed a private anti-trust action in federal district court in Washington state, seeking a declaration that certain agreements were void and unenforceable. Twenty-seven months later, one of the defendants, a Canadian citizen, initiated an action for damages in Canada for breach of those same agreements. The district court enjoined the Canadian action, and the Ninth Circuit affirmed on the grounds that the contract claim brought in Canada was a compulsory counterclaim under the Federal Rules of Civil Procedure, and the application of the Federal Rules presented an overriding interest.

**23.** Plaintiff has not pointed to any precedent for a federal district court enjoining an earlier-filed foreign proceeding. Although the "first to file" rule is not inflexible, other equitable factors in this case counsel against making an exception to the rule.

**24.** The dispute over Plaintiff's employment status concerns the period between 1992 and 1994, after Plaintiff had relocated to the United States.

he can expect to have to abide by English law in the course of his English business dealings.

c. *In Rem or Quasi In Rem Action.* Both actions here are in personam, so there is no threat to this Court's in rem or quasi in rem jurisdiction.

d. *Other Equitable Considerations.* Plaintiff has presented no other equitable factors in support of enjoining enforcement of the English Order in England.

The principle of comity is based on "deference to the foreign country's legal, judicial, legislative and administrative system of handling disputes over which it has jurisdiction, in a spirit of international cooperation." *Brinco Mining Ltd. v. Federal Insurance Co.,* 552 F.Supp. 1233 (D.C.1982). If the legal system of any foreign jurisdiction is entitled to deference, certainly that of England is. Although both this Court and the English Court have asserted jurisdiction over this matter, if both courts act to define the rights of the parties exclusively within their respective jurisdictions, the interests of both parties can be protected without the threat of inconsistent judgments.

All of the foregoing constitutes this Court's findings of fact and conclusions of law.

Accordingly,

1. Defendant is hereby enjoined from enforcing or attempting to enforce in the United States the *ex parte* order issued on April 12, 1994, in the matter of *Jardine Insurance Brokers International Limited v. Peter Conroy Robinson,* action no. 1994–J–721, by the High Court of Justice, Queen's Bench Division, London, England.

2. Defendant is not hereby enjoined from enforcing the *ex parte* order in England, nor from serving English court documents on Plaintiff in the United States solely for the purpose of rendering the English Order enforceable in England.

3. This Preliminary Injunction is binding on Jardine Insurance Brokers International Limited, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

4. No person who has notice of this Preliminary Injunction shall fail to comply with the letter and spirit hereof nor shall any person subvert the letter or spirit hereof by any sham, indirection or other artifice.

5. The Court retains jurisdiction to modify this Preliminary Injunction at any time and from time to time on its own motion or upon the motion of any party in the interest of effectuating its intendments or in the interest of furthering the ends of justice under all applicable law.

6. The above Preliminary Injunction is effective upon Plaintiff's filing a security in cash or corporate security in the sum of $5000.