[No. C055192. Third Dist. Feb. 7, 2008.]

ALLIANT INSURANCE SERVICES, INC., et al., Plaintiffs and Respondents, v.
G. SCOTT GADDY, Defendant and Appellant.

**COUNSEL**

Grobaty & Pitet, Christopher L. Pitet, Sommer A. Salam; Adorno, Yoss, Alvarado & Smith and Theodore E. Bacon for Defendant and Appellant.

Musick, Peeler & Garrett, James W. Miller and Cheryl A. Orr for Plaintiffs and Respondents.

**OPINION**

**SIMS, J.**—Respondent Alliant Insurance Services, Inc. (Alliant), is an insurance brokerage business that obtains insurance for construction companies. In 2004, Alliant purchased a competing insurance brokerage, Gaddy Ward & Company Insurance Brokers (GWC), for $4.1 million. Pursuant to the purchase of the business, appellant G. Scott Gaddy, the majority shareholder in GWC, agreed in writing "to refrain from carrying on a business, directly or indirectly, which provides any [of Alliant's] business" within the 58 counties of the State of California.

When it learned that Gaddy was contacting its clients, Alliant sought and obtained a preliminary injunction which, among other things, prohibits Gaddy from carrying on business directly or indirectly which "provides any company business" within the 58 counties of California.

Gaddy appeals. He contends the geographic scope of the injunction is unlawful. He argues it should be limited to only four counties where, according to Gaddy, Alliant has construction clients.

For reasons that follow, we shall reject Gaddy's arguments and affirm the order granting the preliminary injunction. We find no reason to refuse to enforce the geographic restriction—the 58 counties of the State of California—that Gaddy expressly agreed to when he sold GWC for $4.1 million.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 17, 2007, plaintiffs Alliant and GWC filed a complaint for breach of contract, misappropriation of trade secrets, breach of fiduciary duty, tortious interference with business relationships, conversion, and a request for a permanent injunction. The complaint alleged that, on April 22, 2004, Alliant purchased its competitor, GWC, for $4.1 million. Defendant was a majority shareholder of GWC at the time of purchase and then became employed by Alliant until he was terminated in October 2006.[1] The stock purchase agreement, to which defendant was both a party and principal signatory, contained a covenant that defendant would not compete in the insurance business for a specified time (through Mar. 31, 2009). Defendant's employment agreement (Senior Management Agreement) contained the same non-competition covenant. Each contract also contained a covenant whereby defendant agreed not to solicit any clients of Alliant (known to defendant by virtue of his employment at Alliant) or GWC for three years after termination of employment.

Thus, section 9.3 of the stock purchase agreement and Senior Management Agreement each provided in part:

"The Sellers acknowledge and agree that substantial and valuable assets which belong to the Company include the trade names, Confidential Information, relationships with Clients[2] and Active Prospective Clients, and Goodwill of the Company, and that the relationships which the Company have [*sic*] with its employees and independent producers are significant business relationships necessary for the Company to continue to operate its business. The [sellers] further acknowledge and agree that, following the Closing, such Sellers will continue to have access to the aforesaid assets and relationships, as well as access to similar assets and relationships of other Alliant Companies, by virtue of continued employment with the Company following the Closing. The Sellers further acknowledge and agree that each of Buyer,

---

[1] Defendant's partner in GWC, Harry Stanley Ward, also sold his interest to Alliant and is currently employed by Alliant.

[2] The stock purchase agreement defined "Client" as "with respect to a specified Person, any other Person to whom or which such specified Person (or any of its employees or independent producers on behalf of such specified Person) has provided, at any time within the 24 months preceding a specified date, any services that such specified Person provides in the conduct of its business."

the Company and the other Alliant Companies has a reasonable, necessary and legitimate business interest in protecting the aforesaid assets and relationships and businesses, and that the covenants set forth below are reasonable and necessary in order to protect these legitimate business interests. The Sellers further acknowledge and agree that the payment at Closing of the portion of the Purchase Price due at Closing shall constitute full consideration for such covenants . . . . In addition, the Sellers acknowledge and agree that monetary damages will not be an adequate remedy for any material breach of any of their covenants contained in this Section 9.3, and that irreparable injury may result to Buyer, the Company and/or other Alliant Companies, or their successors in interest, in the event of any such material breach. . . . [¶] . . . [¶]

"(b) Each Seller will not, directly or indirectly, solicit the provision of any Company Business[3] from, or provide, accept any offer to provide or otherwise induce the termination or non-renewal of any Company Business to, any Client or Active Prospective Client of the Company or any other Alliant Company (provided in the latter case, that such Seller had substantial contact or became familiar with such Client or Active Prospective Client during his employment with the Company), except in the normal course of business on behalf of the Company or such other Alliant Company. The restrictions contained in this subsection (b) shall terminate upon the later of: (i) five (5) years after the Economic Effective Date or (ii) three (3) years after the effective date on which such Seller's employment, if any, with the Company, or its successors in interest, terminates, unless such Seller is entitled following such termination to severance or commission sharing payments for a period extending beyond such three (3) year period, in which event the restrictive period under this clause (ii) shall terminate the end of such payment period. . . .

"(c) Each seller hereby agrees to refrain from Carrying on a Business, directly or indirectly, which provides any Company Business within the Restricted Territory [defined in the contracts as 'the 58 counties of the state of California']. The restrictions contained in this subsection (c) shall terminate (i) in the case of a Majority Shareholder, upon the later of (A) five (5) years after the Economic Effective Date or (B) two (2) years after the effective date on which such Seller's employment with the Company, or its successors in interest, terminates, unless such Seller is entitled following such termination to severance or commission sharing payments for a period extending beyond

---

[3] "Company Business" was defined as "any insurance agency or brokerage services, or any services relating thereto (including, by way of example, any risk management or loss control services, reinsurance intermediary services, third party administration, claims processing or underwriting services, program management or administration services, managing general agency or managing general underwriting services, any employee pension and welfare benefit plan design and services, actuarial consulting and employee communication services)."

such two (2) year period, in which event the restrictive period under this clause (i)(B) shall terminate at the end of such payment period . . . ."

The complaint alleged that defendant, after termination of his employment, began contacting more than 16 GWC clients, misappropriating Alliant's property and trade secrets, and soliciting business from plaintiffs' customers.

Plaintiffs sought a preliminary injunction. Alliant vice-president Gregory Zimmer attested in a declaration that defendant worked for Alliant from 2004 until defendant's termination in October 2006. During his employment, defendant had access to Alliant's confidential customer files. Defendant's former GWC partner, Harry Stanley Ward, who is currently employed by Alliant, attested in a declaration that at least two of plaintiffs' clients moved their accounts to a competitor after being contacted by defendant. Plaintiffs' declarations also stated GWC had its principal place of business in Lodi but provided insurance products to construction-based clients in all "58 counties" of the State of California.

Defendant opposed the request for a preliminary injunction, arguing in part that the covenants against competition and solicitation were illegal and void.

Defendant also submitted his own declaration, attesting in part that "GWC principally did business in four (4) counties, Sacramento, San Joaquin, Stanislaus, and Fresno, though we did have two (2) clients in Sonoma County and one (1) client in Contra Costa County." Defendant admitted contacting his former clients after plaintiffs terminated his employment but disputed that any customer information was confidential. He believed he could act as a consultant to former clients without violating the covenants. He stopped when plaintiffs objected. Defendants' former clients continued to call him. They asked him about other insurers and agents, and defendant "did my best to answer as honestly as I could. Again, at no time did I ever solicit their business or steel [sic] them away from GWC or Alliant." Defendant attested he did not know why customers left plaintiffs "but I do know that the problems that I pointed out to Plaintiff before I left[4] would be a basis for customers to change to a different broker, and I also know that no client left [plaintiffs] based on any action by me."

Defendant also made evidentiary objections to hearsay statements in plaintiffs' declarations about plaintiffs' clients being solicited by defendant.

---

[4] Defendant complained that plaintiffs (1) wanted him to turn over his accounts to other staff members and devote all of his time to bringing in new clients, and (2) changed the manner in which they calculated the earnings of defendant and Ward.

The trial court sustained the evidentiary objections (and we therefore disregard that evidence). However, there was no objection to Ward's statement that at least two clients had moved their accounts from Alliant after being contacted by defendant.

In their reply papers, plaintiffs submitted a supplemental declaration from Ward attesting to conversations with defendant, in which defendant said he intended to start a consulting business providing insurance and surety consulting, and he would need approximately 16 of his old clients and had been contacting them for that purpose. The supplemental declaration asserted plaintiffs' customer information, including commission amounts and policy renewal dates (when clients were most likely to switch to a competitor), was proprietary information. The supplemental declaration also said an essential part of GWC's business was dealing with a nationwide network of insurance companies located in all 58 counties of California as well as the entire United States.

Although the trial court's tentative ruling was to deny a preliminary injunction, the court was concerned about issues raised in the reply papers, and the court allowed defendant the opportunity to testify at the hearing, which he did. In his testimony, defendant said the consulting business he tried to start would not have involved the provision of insurance or bond products but would have encompassed matters such as reviewing financial reports, buy-sell agreements, acquisition strategy, and financial planning. Defendant admitted his conversation with Ward about contacting former clients but denied saying he needed 16 clients. Defendant admitted he initiated contact with "[h]alf a dozen to a dozen" former clients. Defendant said he was aware that plaintiffs lost two clients to a competitor that employed a good friend of defendant's, though defendant denied speaking with the friend about the clients. Defendant acknowledged GWC was licensed not only in California but also in other states, so that GWC could conduct business in those states.

On February 13, 2007, the trial court issued an order granting the preliminary injunction. The court said the information defendant had regarding GWC's former customers, combined with his intimate knowledge of plaintiffs' business operation and customer accounts, constituted trade secrets under Civil Code section 3426.1, subdivision (d),[5] and confidential information within the meaning of the stock purchase agreement. The court noted

---

[5] Civil Code section 3426.1, part of the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) authorizing injunctions against misappropriation of trade secrets, defines trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

defendant admitted he initiated contact with GWC clients after plaintiffs terminated his employment. Defendant failed to substantiate his estimated claim of a $1.5 million loss. A preliminary injunction was necessary to maintain the status quo. Failing to enjoin defendant could result in a subsequent judgment being ineffective and the amount of damages was difficult to ascertain. The court said its determination was based on the stock purchase agreement, but the alleged conduct may also violate the Senior Management Agreement. The court directed plaintiffs to post as security a bond of $250,000.[6]

The court ordered issuance of a preliminary injunction prohibiting defendant from (a) directly or indirectly using or willfully disclosing to any person (without plaintiffs' permission or court approval) information about plaintiffs' clients, as defined by the court; (b) directly or indirectly soliciting plaintiffs' clients within the 58 counties of California; (c) carrying on business directly or indirectly which "provides any Company business" within the 58 counties of California; (d) directly or indirectly soliciting, hiring, retaining the services of plaintiffs' employees or independent producers who were employees or independent producers of GWC or Alliant; (e) destroying or altering any information regarding the facts at issue in this case; and (f) directly or indirectly soliciting, hiring, assisting, or accepting assistance of any other person or entity in attempting to accomplish any of the acts prohibited by the preliminary injunction.

Defendant appeals.[7]

## DISCUSSION

### I. *Standard of Review*

We review an order granting a preliminary injunction, under an abuse of discretion standard, to determine whether the trial court abused its discretion in evaluating the two interrelated factors pertinent to issuance of a preliminary injunction—(1) the likelihood that the plaintiffs will prevail on the merits at trial, and (2) the interim harm that the plaintiffs are likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued. (*Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 432–433 [9 Cal.Rptr.3d 257].) Abuse of discretion as to either factor warrants reversal. (*Carsten v. City of Del Mar* (1992) 8 Cal.App.4th 1642, 1649 [11 Cal.Rptr.2d 252].)

---

[6] Defendant claims plaintiffs owe him $250,000 in unpaid commissions, $200,000 in separation payments, and $560,000 under the stock purchase agreement.

[7] An order granting an injunction is appealable. (Code Civ. Proc., § 904.1, subd. (a)(6).)

Where the likelihood of prevailing on the merits depends upon a question of law such as statutory construction, the question on appeal is whether the trial court correctly interpreted and applied the law, which we review de novo. (*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1072 [48 Cal.Rptr.3d 614] (*Strategix*).)

"In determining the validity of the injunction, we look at the evidence presented to the trial court to determine if there was substantial support for the trial court's determination that the plaintiff was entitled to the relief granted." (*Monogram Industries, Inc. v. Sar Industries, Inc.* (1976) 64 Cal.App.3d 692, 703 [134 Cal.Rptr. 714] (*Monogram*).) "Where the evidence before the trial court was in conflict, we do not reweigh it or determine the credibility of witnesses on appeal. '[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts.' [Citation.] Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. [Citation.] Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order. [Citations.]" (*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 625 [43 Cal.Rptr.2d 774] (*Shoemaker*), citing *Monogram, supra,* 64 Cal.App.3d at p. 704, among other cases.)

## II. *Validity of Covenants*

Defendant argues the trial court's order enforces illegal restraints on trade. Defendant refers to the two covenants as a noncompetition covenant and a nonsolicitation covenant, whereas plaintiffs call the nonsolicitation covenant a "restrictive provision." We will use defendant's terms, since both covenants restrict competition.

### A. *Noncompetition Covenant*

Although defendant agreed to a noncompetition covenant, which expressly defined the restricted territory as "the 58 counties in the State of California," he argues the covenant is invalid as an illegal restraint on trade because the geographic scope exceeds the territory where GWC did business. We shall conclude the covenant is not invalid on this record.

Thus, "California's public policy affirms a person's right to pursue the lawful occupation of his or her choice. [Citation.] Our Legislature has codified this public policy in [Business and Professions Code] section 16600. It provides, 'Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business

of any kind is to that extent void.' (*Ibid.*)"[8] (*Strategix, supra*, 142 Cal.App.4th at p. 1072.) An exception exists for a noncompetition covenant in connection with the sale of a business, pursuant to section 16601, which provides in part: "Any person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity, . . . may agree with the buyer to refrain from carrying on a similar business within *a specified geographic area*[9] *in which the business so sold . . . has been carried on*, so long as the buyer, or any person deriving title to the goodwill or ownership interest from the buyer, carries on a like business therein." (Italics added.)

The reason for this exception to the general rule against noncompetition covenants is to prevent the seller from depriving the buyer of the full value of its acquisition, including the sold company's goodwill. (*Strategix, supra*, 142 Cal.App.4th at p. 1073.) "It was the policy of the [common] law, within reasonable limits, to protect the purchaser in the enjoyment of the good will which he had purchased and paid for." (*Kaplan v. Nalpak Corp.* (1958) 158 Cal.App.2d 197, 200 [322 P.2d 226] (*Kaplan*).) The sold business's goodwill is the " ' "expectation of . . . that patronage which has become an asset of the business." ' " (*Strategix, supra*, 142 Cal.App.4th at p. 1073.) The geographic scope of a noncompetition covenant must be limited to the area where the sold company carried on business because "[o]therwise, a seller could be barred from engaging in its business in places where it poses little threat of undercutting the company it sold to the buyer." (*Ibid.*)

*Monogram, supra*, 64 Cal.App.3d 692, upheld a preliminary injunction prohibiting competition anywhere within the United States following the sale of a business. The seller there argued the sold business was a mere subcontractor for the buyer, and the subcontracting activities (making prototype toilets for the buyer's "Magic Flush System") were confined to the area of Laguna Niguel and Los Angeles. (*Id.* at pp. 698–701.) The appellate court said, "Prior to the acquisition Modular [the sold company] had achieved a favorable identity in the field on a nationwide basis. Monogram, in marketing the Magic Flush System [nationwide] with the identifiable Modular component, was creating additional 'goodwill' for Modular. A business can develop

---

[8] Undesignated statutory references are to the Business and Professions Code.

[9] This language in section 16601 was added in a 2002 amendment that replaced the former language ("specified county or counties, city or cities, or a part thereof"). (Stats. 2002, ch. 179, § 1.) The change reflects that a noncompetition covenant may be held to extend beyond California's boundaries. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 601 (2001–2002 Reg. Sess.) as amended June 3, 2002, pp. 6–7.) The "specified county or counties" language was enacted in 1941, replacing the original language of the predecessor statute, Civil Code former section 1674, which limited noncompetition covenants to a single city or county. (Stats. 1941, ch. 526, § 1, p. 1834; Historical and Statutory Notes, 5 West's Ann. Bus. & Prof. Code (1997 ed.) foll. § 16601, p. 37.)

and enjoy a public 'goodwill' even though its product is sold by another company as a component of the latter's end product." (*Id.* at p. 701.) *Monogram* noted that, although section 16601 is designed to protect the buyer of business "goodwill," it "does not limit its application to transactions involving any quantum of prior sales activity. In fact in describing the permissible area to be covered by a covenant not to compete it speaks of where the business was 'carried on' rather than the extent of the 'goodwill.' The two terms are not necessarily synonymous. In *Kaplan . . . , supra,* 158 Cal.App.2d 197, the seller of shares in a manufacturing corporation sought to limit the scope of a covenant not to compete to the county in which the corporation maintained its plant and shipping department. He claimed that that was where the business was 'carried on' even though the corporation had substantial sales in 30 counties. [¶] The court there [*Kaplan*] rejected this narrow interpretation, and in so doing held that the area in which a business is carried on is as broad as the area where the goodwill of the business has been established. [¶] In light of the context of that holding we [*Monogram*] conclude that the [*Kaplan*] court was not limiting the area to that of the 'goodwill' of the business, but was in effect saying, by way of rejecting the limited interpretation of the seller, that the area was *at least* as broad as the area where the 'goodwill' had been established."[10] (*Monogram, supra,* 64 Cal.App.3d at pp. 701–702.)

■ *Monogram, supra,* 64 Cal.App.3d 692, held "the area where a business is 'carried on' [within the meaning of section 16601] is not limited to the locations of its buildings, plants and warehouses, nor the area in which it actually made sales. The territorial limits are coextensive with the entire area in which the parties conducted all phases of their business including production, promotional and marketing activities as well as sales." (*Id.* at p. 702.)

*Monogram* also said, "The language of [section 16601] insures that the competition is in fact such and not simply insubstantial and infrequent or isolated transactions. [Citations.]" (*Monogram, supra,* 64 Cal.App.3d at p. 698.) *Monogram* cited, among other authorities, *Swenson v. File* (1970) 3 Cal.3d 389 [90 Cal.Rptr. 580, 475 P.2d 852], which said with respect to the

---

[10] Although *Monogram* suggested a noncompetition covenant can extend beyond the area where goodwill was established, the cited authority, *Kaplan*, said, "The policy implicit in section 16601 [to protect the purchaser in the enjoyment of the goodwill he has purchased] seems more nearly consistent with the common-law rule under which the territorial limits for permissible operation of covenants in restraint of competition were *coextensive* with the area in which the good will of the business in question had been established." (*Kaplan, supra,* 158 Cal.App.2d at p. 201, italics added.) We have no need to address the matter in this case, because there is no indication GWC, which was by its nature a relationship business, carried on business anywhere without goodwill.

comparable statute (§ 16602) authorizing geographically limited noncompetition covenants upon dissolution of partnerships: "[W]e [the California Supreme Court] do not believe that the Legislature intended [the statute] to sanction restraints upon all business transactions of whatever character, regardless of their noncompetitive effect, their insubstantial nature, or their infrequent occurrence. Instead, we [the California Supreme Court] have concluded that in using the words 'carry on a similar business,' the Legislature had in mind the direct or indirect transaction or solicitation of substantial business activities in competition with the covenantee (see *Kaplan v. Nalpak Corp., supra*, 158 Cal.App.2d 197, 203), rather than the occurrence of isolated, occasional transactions not substantially affecting the covenantee's competition position." (*Swenson, supra*, 3 Cal.3d at p. 397.) *Swenson* added, "Ordinarily, a single, isolated transaction does not constitute 'carrying on business' under statutes using that or similar terminology. [Citation.]" (*Id.* at p. 397, fn. 5.)

Here, the "specified geographic area" defined in the covenant and in the trial court's order was the entire State of California.

Defendant argues the evidence showed that GWC, which was physically located in Lodi, "carried on its business primarily in Sacramento, San Joaquin, Stanislaus and Fresno [C]ounties."

Plaintiffs' brief on appeal agrees GWC's construction clients were "located mostly in Northern California," but plaintiffs argue another part of GWC's business involved relationships with the insurance companies which provided the products for the construction clients.

Thus, in support of their request for a preliminary injunction, plaintiffs submitted a declaration from defendant's former GWC partner, Harry Stanley Ward, who attested that GWC was a California corporation, with its primary place of business in Lodi, which was engaged in "providing insurance related services to the construction industry throughout the State of California." Plaintiffs also submitted a declaration of Alliant vice-president Gregory Zimmer, who attested: "Prior to the time of its purchase by Alliant on April 22, 2004 [GWC], was an insurance agency and broker with its principal place of business in Lodi, California and was a competitor to Alliant, particularly in providing insurance products to construction based clients and prospective clients located in all 58 counties in the State of California."

In opposition to the request for preliminary injunction, defendant submitted his own declaration attesting "GWC principally did business in four (4) counties, Sacramento, San Joaquin, Stanislaus, and Fresno, though [GWC] did have two (2) clients in Sonoma County and one (1) client in Contra Costa County."

In reply, Ward's supplemental declaration did not dispute that GWC's construction clients were based in those counties, but the declaration asserted that another part of its business consisted of procuring insurance from insurance companies throughout California. The supplemental declaration stated in part: "[GWC] provided brokerage services to construction clients to find them the most competitive insurance programs for their casualty needs, including property, automobile, general liability, and workers compensation, as well as to provide surety services, which include construction completion bonds that are required by the public and private entities. [¶] [GWC]'s client base started in 1996 with approximately 25 construction based companies, and swelled to nearly 100 companies by the time we sold the [GWC] clients as well as all other [GWC] assets to Alliant in 2004. [GWC] carried on its business in the following manner: [¶] [GWC] would contact its construction clients and prospective clients to gather information concerning the nature and extent of their construction practice located throughout the state of California in order to determine what type of insurance and surety products would be necessary for the particular construction company. In order to provide appropriate insurance products, an essential part of [GWC]'s business was to determine the type of insurance and surety policies available as well as the price for those products from numerous insurance companies located throughout the 58 counties of California, as well as the entire United States. Typically, after [GWC] obtained insurance products and premium quotes from several insurance providers, it would present the competitive programs and premium quotes to the construction client who would make the decision as to which insurance program would be accepted based in part on the recommendations of [GWC]. Once [GWC]'s construction client accepted an insurance proposal, [GWC] would interact with the selected insurance provider to formalize the insurance commitment and thereafter [GWC] would be compensated in one of two ways: the construction client paid [GWC] a fee for [its] 'brokerage services,' or the insurance provider would pay [GWC] a commission out of the premium that the construction client pays for the actual insurance coverage. The interaction with the nationwide network of insurance providers is essential to carrying on [GWC]'s business as an insurance broker for construction clients. [GWC] would not be able to engage in or carry on its business of providing insurance brokerage services without the relationships that it had with both its construction clients and the insurance providers. As such, [GWC]'s business relationships were two fold: on the one hand providing the broker services to its construction clients, and on the other hand engaging in business with the insurance provider companies that it worked with to provide the actual policies to the [GWC] clients."

The supplemental declaration also said, "insurance companies normally will only work with one broker or brokerage firm. In other words, the insurance company will reserve 'the market' for its existing broker to send in

an 'application' to the client company, and will only provide premium quotes for this first applying broker or brokerage firm." On its face, this statement supports a conclusion that the "goodwill" that defendant sold to plaintiffs included the goodwill of the insurance companies that supplied policies for GWC's clients. Indeed, the covenants themselves stated that GWC's relationships with its independent producers were significant business relationships necessary for GWC's operation.

This latter statement in the supplemental declaration was made in connection with the issue of trade secrets pertinent to the nonsolicitation covenant, i.e., that knowledge of policy renewal dates gave an advantage in securing favorable quotes from insurance companies. Nevertheless, it provides evidence supporting the trial court's determination to issue the preliminary injunction regarding both covenants.

Thus, the supplemental declaration indicated there were two components to GWC's business—(1) selling insurance to construction clients, and (2) procuring insurance from insurance companies. Procuring insurance from insurance companies is analogous to the "production" referred to in *Monogram, supra*, 64 Cal.App.3d at page 702 ("territorial limits are coextensive with the entire area in which the parties conducted all phases of their business including production, promotional and marketing activities as well as sales . . ."). GWC's business was a business in which personal relationships were important in both aspects of the business—selling insurance products and procuring those products. The supplemental declaration provided evidence that the goodwill generated by GWC with insurance companies gave GWC a competitive advantage in servicing its construction clients. The covenants executed by defendant recognized the significance of GWC's relationships with its independent producers, as necessary for GWC's operation. Thus, this case is not similar to defendant's hypothetical of a local toy store that "happens to get" some of its toys from China.

The trial court also had before it evidence (Ward's declaration) that GWC procured the products from insurance companies located throughout the 58 counties of California. Defendant's appellate brief admits it is "probably true" that GWC obtained policies from insurance companies "throughout the United States."

"Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. [Citation.] Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order. [Citations.]" (*Shoemaker, supra*, 37 Cal.App.4th at p. 625.)

■ Ward's supplemental declaration provides substantial evidence that GWC "carried on" its business in all 58 counties of the State of California within the meaning of section 16601. Accordingly, we conclude defendant fails to show the noncompetition covenant is an illegal restraint on trade. We need not address plaintiffs' argument that the fact GWC was licensed to transact business in other states, such as Hawaii and Nevada, supported the conclusion that GWC carried on business throughout the entire State of California.

### B. *Nonsolicitation Covenant*

As to the nonsolicitation covenant, defendant argues it is illegal because it prohibits defendant from soliciting not only clients of the business defendant sold (GWC) but also Alliant's other customers. We shall conclude defendant's argument is without merit.

■ Defendant relies entirely on a rule relating to a nonsolicitation covenant in connection with the sale of a business, i.e., the covenant is permissible if it prohibits the seller from soliciting the *seller*'s clients but is not permissible if it prohibits the seller from soliciting the *buyer*'s clients. (*Strategix, supra*, 142 Cal.App.4th 1068.) There are two reasons for this rule. First, the rationale for enforcing nonsolicitation covenants—i.e., they prevent the seller from depriving the buyer of the full value of its acquisition, including the sold company's goodwill—does not extend to the buyer's other customers. (*Id.* at p. 1073.) Second, the seller presumably knows who its own clients are but does not necessarily know who the buyer's other clients are. (*Id.* at p. 1074.)

Here, however, defendant not only sold his business to plaintiffs, he then became an employee of plaintiffs. The nonsolicitation covenant in both the stock purchase agreement and the Senior Management Agreement limited the scope of the nonsolicitation covenant, stating defendant (Seller) would not solicit the clients of GWC or any other Alliant company "(provided in the latter case [any other Alliant company], that such Seller had substantial contact or became familiar with such Client or Active Prospective Client during his employment with the Company) . . . ." Thus, the covenant prohibiting solicitation of Alliant's other customers related only to defendant's employment by Alliant, not his sale of GWC.

■ A covenant for an employee not to solicit the employer's clients upon termination of the employment may be valid if necessary to protect the employer's trade secrets. (*Thompson v. Impaxx, Inc.* (2003) 113 Cal.App.4th 1425, 1429 [7 Cal.Rptr.3d 427].) Plaintiffs asserted in the trial court that their confidential client information constituted trade secrets, and the trial court

expressly found defendant used plaintiffs' trade secrets. Defendant failed to challenge this point in his opening brief on appeal, and we decline to consider the argument he makes for the first time in his reply brief. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].)

Though not mentioned by defendant, we observe the trial court's order, while prohibiting defendant from soliciting plaintiffs' clients, also states the court's determination to issue the preliminary injunction was based on the stock purchase agreement, though the parties indicated the conduct to be enjoined may also violate the Senior Management Agreement. Defendant does not argue this point as a basis for reversal. The same nonsolicitation covenant was contained in both contracts and, with respect to solicitation of Alliant clients that were not former GWC clients, the covenant was restricted to Alliant clients with which defendant became familiar through his employment at Alliant. We thus see no problem.

We conclude defendant fails to show invalidity of the nonsolicitation covenant.

### III. *Balancing of Factors*

Defendant argues the trial court abused its discretion in balancing the factors pertinent to issuance of a preliminary injunction—likelihood of prevailing on the merits versus interim harm. We disagree.

### A. *Likelihood of Prevailing on the Merits*

Our previous discussion upholding enforceability of the covenants defeats any argument that invalidity of the covenants makes it unlikely that plaintiffs could prevail on the merits.

Defendant argues plaintiffs failed to show by competent evidence, as required by Code of Civil Procedure section 527,[11] that defendant was engaging in the insurance business and soliciting Alliant's customers. We disagree.

As indicated, we disregard plaintiffs' evidence to which the trial court sustained defendant's evidentiary objections.

However, we can and do consider Ward's supplemental declaration filed with plaintiffs' reply. Although defendant argues in a footnote that it was

---

[11] Code of Civil Procedure section 527, subdivision (a), provides for issuance of a preliminary injunction if the applicant "show[s] satisfactorily that sufficient grounds exist therefor."

inappropriate for plaintiffs to present new facts in their reply papers, his cited authority merely states the general rule that a reviewing court will not consider new issues presented in a reply brief on appeal. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770].) Even if we were to consider defendant's forfeiture argument, inadequately raised in a footnote (*Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1343, fn. 9 [111 Cal.Rptr.2d 577]), the trial court had discretion whether to accept new evidence with the reply papers. (*Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8 [13 Cal.Rptr.2d 811] [in summary judgment case, trial court had discretion to consider new evidence in reply papers as long as other party had opportunity to respond].) Here, in light of the supplemental declaration, the trial court allowed defendant the opportunity to testify at the hearing on the preliminary injunction, and he did.

Ward's supplemental declaration stated in part that defendant contacted Ward the day after his termination and "indicated to me [Ward] his intention to start a consulting business providing insurance and surety consulting. I informed him that he should not engage in this behavior as it was contrary to our agreement signed with Alliant. Approximately one week after this coffee meeting, on the day that [defendant] came to the office to pick up his personal items, [defendant] indicated to me that his consulting venture appeared to be going well, and that he would only need approximately 16 of his old clients and that he had been contacting them in regards to such an enterprise. . . . [Defendant] also stated that the clients he was contacting were 'his clients,' and he didn't see anything wrong with contacting them."

The supplemental declaration further stated that Ward saw defendant at business locations of plaintiffs' clients after defendant was terminated, and that plaintiffs lost the account of one such client less than two months after defendant was seen speaking with the client.

Defendant testified in court that, after about half his clients contacted him, he initiated contact with "[h]alf a dozen to a dozen" of his other clients. Defendant testified the reason he considered starting a consulting business was that plaintiffs had failed to pay him commissions they owed him, and he needed to make a living.[12] His experience is in insurance and surety. He did some consulting work 12 or 13 years earlier, so he thought management

---

[12] As plaintiffs' attorney noted in the trial court, the restrictive covenants by their own terms stated that "payment at Closing of the portion of the Purchase Price due at Closing shall constitute full consideration for such covenants, and failure to pay any other portion of the Purchase Price shall not relieve any Seller from his or its obligations pursuant to such covenants." Defendant admitted he received the payment due at closing—$1.4 million.

consulting in the construction industry would provide income without conflicting with plaintiffs' business. Defendant testified he was aware that plaintiffs had lost two clients to a competitor brokerage firm where defendant's friend worked.

Thus, there was evidence supporting the trial court's decision.

Defendant cites his own evidence, e.g., that his former clients were friends and contacted him; that he told them to stay with plaintiffs; and that he never signed any contracts with former clients and backed off when plaintiffs objected.

However, the trial court was not required to accept defendant's version of events and was not required to accept his assertion that his "consulting" business would not compete with plaintiffs' business. Where the evidence for and against an injunction is conflicting, we do not reweigh it but merely determine whether substantial evidence supports the trial court's determination. (*Monogram, supra*, 64 Cal.App.3d at p. 703.) There was evidence that defendant did more than merely announce future job plans to his former clients, as he asserts on appeal (*Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812 [39 Cal.Rptr.2d 887]); there was evidence he solicited former clients for his new business.

Defendant argues plaintiffs were not likely to prevail on the merits, because their breach of the agreements excused defendant's performance. Defendant says Alliant made only the first payment ($1.4 million) on the stock purchase agreement and did not make "earn out" payments due three and four years after closing, totaling over $900,000. Defendant claims it is undisputed that Alliant refuses to pay. However, defendant cites only his own declaration; he cites nothing showing an admission by plaintiffs. We note plaintiffs' reply papers in the trial court argued defendant was claiming money arising from his employment, not his sale of the business, and the stock purchase agreement expressly stated (1) payment of the $1.4 million (payment of which defendant acknowledges) was full consideration for the restrictive covenants, and (2) any failure by plaintiffs to pay the balance of the purchase price did not relieve defendant from the covenants. Defendant's declaration did refer to most of the claimed monies as being related to his employment, separation payments postemployment, and "earn out," and defendant fails to acknowledge or show error in the trial court's finding that

"[t]he issue raised by the Defendant regarding the Plaintiffs' having breached the contract as to the payment of his commission appears to be an issue relative to the Senior Management Agreement, not the Stock Purchase Agreement."[13] Finally, the authority relied upon by defendant, *Pry Corp. of America v. Leach* (1960) 177 Cal.App.2d 632 [2 Cal.Rptr. 425], does not support his position. It affirmed a judgment for the plaintiffs in a suit for an injunction against unfair competition. The defendant argued on appeal that the trial court erred in denying his cross-complaint for breach of contract. (*Id.* at p. 638.) The appellate court rejected the argument, because the defendant himself breached the contract, and a party complaining of a breach is not entitled to recover unless he has fulfilled his obligations. (*Id.* at pp. 639–640.) Here, recovery is not yet an issue, because this appeal involves only a preliminary injunction, not a final judgment.

Under all these circumstances, we reject defendant's argument that reversal is warranted by his claim that his performance was excused by a breach of the contract by plaintiffs. It does not matter, as claimed by defendant in his reply brief, that he says plaintiffs breached first.

We conclude the trial court did not abuse its discretion in determining that plaintiffs showed a likelihood of prevailing on the merits sufficient for issuance of a preliminary injunction.

### B. *Interim Harm*

Defendant argues the interim harm issue unquestionably favors him, because the harm suffered by him not being able to work until March 2009 outweighs the interim harm to Alliant from potential loss of a few clients. We shall conclude defendant fails to establish this point.

We note the trial court concluded defendant's declaration failed to provide sufficient evidence to substantiate his claim that he would suffer estimated losses of $1.5 million. Defendant fails to show the trial court abused its discretion.

Defendant claims "[n]o case could be more on point" than *Hilb, Rogal & Hamilton Ins. Services v. Robb, supra,* 33 Cal.App.4th 1812. However, *Hilb* merely determined the trial court did not abuse its discretion in *denying* injunctive relief. Here, the question is whether the trial court abused its discretion in *granting* injunctive relief. A trial court will be found to have

---

[13] The parties agree the purchase price for GWC was $4.1 million, which is much more than the $1.4 million paid at closing. The contract says the purchase price is $4.1 million subject to or in addition to several qualifications and calculations. This appeal does not require us to sort out the numbers.

abused its discretion only when it has exceeded the bounds of reason or contravened uncontradicted evidence. (*Id.* at p. 1819.) The burden rests with the party challenging the trial court's ruling to make a clear showing of an abuse of discretion. (*Ibid.*) Moreover, the defendant in *Hilb* was paid only $52,000 for the noncompetition covenant. (*Id.* at pp. 1817–1818.) Here, defendant received $1.4 million.

Defendant also cites *Robinson v. Jardine Ins. Brokers Intern. Ltd.* (N.D.Cal. 1994) 856 F.Supp. 554 (*Robinson*), where a federal district court judge (not an appellate court) concluded a former employee would suffer more harm than his employer if the court denied the former employee's request for a preliminary injunction prohibiting the employer from enforcing a noncompetition clause in the employment contract. The judge said the employer had not even attempted to identify a legally protected trade secret and had failed to explain how the potential loss of a few clients and employees to a company of its size outweighed the hardship to an individual employee. (*Id.* at p. 559.)

However, *Robinson* is distinguishable on several grounds. First, it did not involve an abuse of discretion standard of review because it was a federal district court case, not an appellate case. Here, we are reviewing what the trial court did under an abuse of discretion standard. Second, *Robinson* did not involve the sale of a business but merely a noncompetition covenant in an employment contract. Indeed, the federal district court expressly stated that the rule it was applying (§ 16600's restriction on contracts restraining a person from engaging in a business) had an exception, inapplicable in the case before the federal court, where the party sought to be restrained had sold a business to the party seeking the restraint. (*Robinson, supra*, 856 F.Supp. at p. 558, fn. 15.) Third, unlike *Robinson*, where the employer did not even attempt to identify a legally protected trade secret, plaintiffs in the case before us did present evidence that its confidential customer information, particularly policy expiration dates (when customers were more inclined to make a move), constituted legally protected trade secrets. Additionally, plaintiffs' declarations said that before the sale GWC was a competitor of Alliant's and GWC had about 100 clients when it was sold to Alliant, and defendant admitted contacting up to a dozen clients after Alliant terminated his employment.

Based on the foregoing evidence, we conclude defendant has failed to show any abuse of discretion by the trial court.

## DISPOSITION

The order granting the preliminary injunction is affirmed. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Scotland, P. J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 14, 2008, S161879.