[Civ. No. 48614. Second Dist., Div. Two. Dec. 8, 1976.]

MONOGRAM INDUSTRIES, INC., Plaintiff and Respondent, v. SAR INDUSTRIES, INC., et al., Defendants and Appellants.

---

## COUNSEL

Sheppard, Mullin, Richter & Hampton, John A. Sturgeon and Don T. Hibner, Jr., for Defendants and Appellants.

Richards, Watson, Dreyfuss & Gershon, Harry L. Gershon and Margaret Eve Spencer for Plaintiff and Respondent.

---

## OPINION

**COMPTON, J.**—Monogram Industries, Inc., a company engaged in, among other things, the production and marketing of portable or nonconventional toilet systems, commenced this action against Sar Industries, Inc., Sarmax Corporation, Norris J. Bishton, Jr., and John S. Blick III, which entities and persons are engaged in a similar business, seeking damages for misappropriation of trade secrets and an injunction to enforce a covenant not to compete and negative provisions of a consulting agreement.

The trial court, on motion of Monogram, and after hearing thereon, issued a preliminary injunction paralleling the terms of the covenant not to compete.[1] Defendants appeal from the order. They contend that the covenant as written was void and in any event the injunction is overly broad in scope as to the activity prevented and the territory covered.

Prior to October 31, 1973, defendant Bishton was executive vice president of Monogram and defendant Blick was the owner of two-thirds of all the outstanding shares of Modular Manufacturing, Inc. (Modular). Blick and one Fuller, who owned the remaining one-third of the stock, had formed Modular approximately 16 months earlier.

On the above-mentioned date, and as a result of negotiations between Bishton and Blick, Monogram purchased from Blick and Fuller all of the stock in Modular. In conjunction with that purchase and sale, Blick and Fuller executed the consulting agreement and a covenant not to compete.

The covenant states in part:

"This covenant is entered into this 31st day of October, 1973, by and among MONOGRAM INDUSTRIES, INC., a Delaware corporation, hereinafter called 'Company' and John S. Blick, III and Ralph Fuller, hereinafter called 'Covenantors.'

"1. Covenantors covenant and agree that for . . . five (5) years . . . they will not, [become involved in any business activity within the United States, Puerto Rico, the Virgin Islands and Canada] which is directly competitive with any aspect of the business of Company as presently conducted, and as said business may evolve in the ordinary course between the date of this Covenant and its termination. For the purposes of this Agreement, 'competitive business' shall mean any business in the fields of Modular building structures, sanitation or sanitation products."

This action was commenced on July 14, 1975, and on September 25, 1975, the trial court issued a preliminary injunction as follows:

"IT IS ORDERED that, during the pendency of this action or until further order of this Court:

---

[1] It appears that the preliminary injunction was issued solely on the basis of the covenant not to compete. Thus, we are not further concerned with the terms of the consulting agreement.

"1. Defendant JOHN S. BLICK, III be, and he is hereby enjoined and restrained from owning, managing, operating, joining, controlling, being employed by or performing services in, or being in any other manner connected with, any business activity being conducted or operated by any person, firm or corporation other than plaintiff, in the fields of design, manufacture, marketing and sale of modular building structures, sanitation units and sanitation products.

"2. Defendant SAR INDUSTRIES, INC., a corporation, SARMAX CORPORATION, a corporation, and NORRIS J. BISHTON, JR., and each of them, and each and all of their officers, agents, employees and representatives, and all persons acting in concert or participation with them or any of them, be, and they are hereby, restrained and enjoined from employing or continuing the employment of, and from soliciting, receiving, or accepting the performance of services by defendant JOHN S. BLICK, III, in the fields of design, manufacture, marketing and sale of modular building structures, sanitation units and sanitation products."

In California with certain limited exceptions a contract under which a person is prevented from engaging in a profession, trade or business is void. (Bus. & Prof. Code, § 16600.) The specific exception relevant here is found in Business and Professions Code section 16601 which permits a person who sells the goodwill of a business or all of his shares in a corporation to agree with the buyer not to carry on a similar business *in the area where the business or corporation has previously carried on its business for so long as the buyer carries on a like business therein.*

Covenants not to compete have been the subject of a considerable amount of attention from legal writers and courts. The number of texts, treatises and judicial opinions that have been written in the field constitutes a "sea-vast and vacillating, overlapping and bewildering" and the sheer volume can "drown the researcher." (*Arthur Murray Dance Studios of Cleveland* v. *Witman,* 62 Ohio L.Abs. 17 [105 N.E.2d 685 at p. 687]; also see Blake, *Employee Covenants Not to Compete,* 73 Harv.L. Rev., 625.)

A few generalizations, however, can be stated. These covenants generally have their genesis in either an employer-employee relationship, or in the sale of the "goodwill" of a business. Covenants arising out of the sale of a business are more liberally enforced than those arising out of the employer-employee relationship. Covenants which are designed simply to prevent competition per se are unenforceable.

Enforceability appears to rest on a notion, often unarticulated, of preventing "unfair" competition.

■ In the case of the sale of the goodwill of a business it is "unfair" for the seller to engage in competition which diminishes the value of the asset he sold. In order to protect the buyer from that type of "unfair" competition, a covenant not to compete will be enforced to the extent that it is reasonable and necessary in terms of time, activity and territory to protect the buyer's interest. (*United States* v. *Addystone Pipe & Steel Co.,* 85 F. 271, 282-283, affd. 175 U.S. 211 [44 L.Ed. 136, 20 S.Ct. 96].)

■ In brief at common law a restraint against competition was valid to the extent it reasonably provided for the protection of a valid interest of the covenantee. (Corbin on Contracts, § 1387 at pp. 55-56; § 1393 at p. 87; Rest., Contracts, § 516, subd. (a).) Business and Professions Code section 16601 is a codification of this rule of "reasonableness" in connection with the sale of a business. (*City Carpet, etc. Works* v. *Jones,* 102 Cal. 506 [36 P. 841].)

That section permits a covenant not to engage in a business "similar" to the one sold, in the area where the business sold has been carried on, so long as the buyer carries on a like business therein. The buyer's business need not use the same name or similar organization. (*Consolidated etc. Industries, Inc.* v. *Marks,* 109 Cal.App.2d 310 [240 P.2d 718].) The language of the section insures that the competition is in fact such and not simply insubstantial and infrequent or isolated transactions. (*Kaplan* v. *Nalpak Corp.,* 158 Cal.App.2d 197 [322 P.2d 226]; *Swenson* v. *File,* 3 Cal.3d 389 [90 Cal.Rptr. 580, 475 P.2d 852]; *Roberts* v. *Pfefer,* 13 Cal.App.3d 93 [91 Cal.Rptr. 308].)

To understand defendants' contentions here, it is necessary to set forth the factual background. In doing so we, of course, present the evidence in the light most favorable to the trial court's order. (*Allen* v. *Pitchess,* 36 Cal.App.3d 321 [111 Cal.Rptr. 658].)

As early as 1971 Bishton, who was, as noted earlier, executive vice president of Monogram, was engaged in developing a toilet system utilizing oil as a reusable flushing agent. This concept is in the public domain. It has the advantage of being able to be used where septic tanks and sewers are not available. It also obviates the need for large quantities of water. Monogram called its particular system the "Magic Flush System."

Modular originally designed and built modular housing and equipment systems for self-contained or alternative . toilet systems. The Modular toilet was designated as the DK 1000. It was readily adaptable for use with a recirculating system such as "Magic Flush" or with a nonflushing tank system.

From its place of manufacture in Laguna Niguel, California, Modular solicited sales of the DK 1000 by mailing out brochures to approximately 500 recipients and press releases to another 200 potential customers. At a trade show in Las Vegas another 250 brochures were distributed. Orders were received from throughout California, New Mexico, Virginia, Michigan, Georgia, Illinois, Wisconsin, and Puerto Rico. Solicitation in trade journals elicited additional inquiries including one from Taiwan. Since self-contained toilet systems are usable in wilderness areas, federal agencies such as the National Park Service and the United States Forest Service were also solicited.

Bishton on behalf of Monogram attended the Las Vegas trade show, received Modular sales materials and saw the possibilities of using the Modular system as a part of the Magic Flush System. Subsequently, Modular was engaged by Monogram as a contractor to build units to house the Magic Flush toilet. Some 160 portable Magic Flush units were ordered from Modular between December 1972 and June 1973. These units were, in turn, widely promoted and marketed by Monogram.

Apparently this production of Magic Flush as well as design and development work on the system for Monogram became the sole activity of Modular between December 1972 until it was purchased by Monogram in October 1973.

Following the purchase, Modular became a subsidiary of Monogram with the name Monogram Sanitation Products, Inc. Blick became president and Fuller vice president of the subsidiary. Blick and Bishton collaborated closely on the design, development, testing, production and marketing of the Magic Flush System. Resources of both Modular and its parent company, Monogram, were used.

Test installations were made at United States Forest Service facilities as well as in a recreational area under the jurisdiction of the State of California. Blick and Bishton made frequent technical as well as sale contacts with government officials who had contracted for these installa-

tions. These contacts were substantially similar to those made by Modular prior to October of 1973.

On June 11, 1974, Blick and Fuller left the employment of Monogram, and on June 12, 1974, Monogram terminated the employment of Bishton as its executive vice president.

Commencing about August of 1974 Blick and Bishton began work on the design and development of what is now known as Sarmax oil toilet system. In October 1975, Blick and Bishton formed Sarmax Corporation. In February 1976, Blick and one Ronald Sargent founded Sar Industries, Inc., which acquired all of the stock of Sarmax.

The Sarmax oil toilet is described by the defendants in their declarations in the trial court as new and differing in design from the Magic Flush except for items readily available from commercial sources. In printed material describing their system defendants, however, have informed potential customers that: ". . . Although Sarmax has been in business for less than one year, the products of its Principals have been operating successfully in public use for more than one year. These Principals were actively in charge of the research, development, marketing, installation and servicing of the Monogram Flush System from its conception until their departure from Monogram. They have subsequently further developed the oil flush systems. The Sarmax system is conceptually identical to the Magic Flush but with substantial improvements thereto."

There can be little doubt that Blick through Sar and Sarmax is engaged in a business "similar" to or "like" that of Modular and Monogram and is in competition with the business now being carried on by Monogram. Although a difference in design and certain improvements over the Monogram toilet are claimed by defendants, their advertising brochures tell the world that their product is born out of the experience of Blick and Bishton in Magic Flush and that the toilet systems are conceptually identical. That Blick's conduct breached the covenant cannot be denied.

■ Defendants contend that the covenant is void. They point to its terms whereby Blick agreed not to compete with "the Company" which is Monogram. The argument goes that Business and Professions Code section 16601 permits only covenants not to compete with the business of the corporation whose stock was sold. In this case, that would be Modular.

We are of the opinion such a construction is tortured and unduly restrictive. The thrust of Business and Professions Code section 16601 is to permit the purchaser of a business to protect himself or itself against competition from the seller which competition would have the effect of reducing the value of the property right that was acquired. Prior to the acquisition of Modular by Monogram, both were engaged in an almost identical field of business. After the acquisition, competition with Modular was competition with Monogram in the field of business in which Modular had been engaged.

A common sense interpretation of the covenant establishes that it was the type of agreement sanctioned by Business and Professions Code section 16601. In agreeing not to compete with the business of Monogram after its acquisition of Modular, Blick contracted not to compete in the field in which both companies were engaged.

■ Defendants argue that the territorial extent of the injunction is overly broad and therefore constitutes an abuse of discretion. They claim that an injunction under section 16601 should be confined to the territorial extent of Modular's business "goodwill" at the time of sale; that Modular was a mere subcontractor for Monogram making only a few prototype toilets for Monogram and thus its activities were confined to the area bounded by Laguna Niguel and Los Angeles.

They argue further that "goodwill" is defined as an expectation of continued future patronage and that Modular had little if any such expectations since in its final months it sold only to Monogram. We disagree.

■ Where a covenant not to compete is executed as an adjunct of a sale of a business there is an inference that the business had a "goodwill" and that it was transferred. (*Mahlstedt* v. *Fugit,* 79 Cal.App.2d 562 [180 P.2d 777].) ■ Prior to the acquisition Modular had achieved a favorable identity in the field on a nationwide basis. Monogram, in marketing the Magic Flush System with the identifiable Modular component, was creating additional "goodwill" for Modular. A business can develop and enjoy a public "goodwill" even though its product is sold by another company as a component of the latter's end product.

We point out that Business and Professions Code section 16601 although designed to protect the buyer of a business' "goodwill" does not limit its application to transactions involving any quantum of prior sales

activity. In fact in describing the permissible area to be covered by a covenant not to compete it speaks of where the business was "carried on" rather than the extent of the "goodwill." The two terms are not necessarily synonymous. In *Kaplan v. Nalpak Corp., supra,* 158 Cal.App.2d 197, the seller of shares in a manufacturing corporation sought to limit the scope of a covenant not to compete to the county in which the corporation maintained its plant and shipping department. He claimed that that was where the business was "carried on" even though the corporation had substantial sales in 30 counties.

The court there rejected this narrow interpretation, and in so doing held that the area in which a business is carried on is as broad as the area where the goodwill of the business has been established.

In light of the context of that holding we conclude that the court was not limiting the area to that of the "goodwill" of the business, but was in effect saying, by way of rejecting the limited interpretation of the seller, that the area was *at least* as broad as the area where the "goodwill" had been established.

We hold that in the provisions of Business and Professions Code section 16601 the area where a business is "carried on" is not limited to the locations of its buildings, plants and warehouses, nor the area in which it actually made sales. The territorial limits are coextensive with the entire area in which the parties conducted all phases of their business including production, promotional and marketing activities as well as sales.

Modular's production and marketing campaign established that it was "doing business" on a nationwide scale even though sales had not been commensurate with Blick's hopes and expectations. Considering the nature of the market being addressed by the parties, city, county or even state boundaries are not significant. The injunction which is commensurate with the covenant appears reasonably necessary to protect Monogram's interest.

In the instant case the covenant was negotiated between Bishton and Blick for their respective firms. Both were officers and fiduciaries of their firms. Both envisioned a maximum saturation of the market by their joint efforts for the product on which they had worked so long. It would only be reasonable to assume that they would bestow this total effort upon their new product, the Sarmax device, and that they would seek to

use the same customers that they had gained while both were employees of Monogram. Viewed in this light, the enforcement of the covenant by an injunction covering the market with which the defendants were very familiar does not seem unreasonable.

The same can be said of the scope of activity from which Blick is enjoined. Its breadth is consistent with the terms of the covenant and is designed to prevent the type of competition from which Monogram is entitled to be protected. Basic to the decision is the recognition that the individual being restrained is a highly skilled, creative manager whose untrammeled competition could do great harm to Monogram. (See 73 Harv.L.Rev. 625, at p. 676.)

■ In determining the validity of the injunction, we look at the evidence presented to the trial court to determine if there was substantial support for the trial court's determination that the plaintiff was entitled to the relief granted. If there is, then the trial court properly exercised its discretion. Where the evidence is conflicting, we do not reweigh it nor do we determine credibility of witnesses. In short, the scope of our review is the same as in the case of any other judgment or order. (*People* v. *Black's Food Stores,* 16 Cal.2d 59 [105 P.2d 361]; *Continental Baking Co.* v. *Katz,* 68 Cal.2d 512 [67 Cal.Rptr. 761, 439 P.2d 889].) Applying these tests, it is patent that the trial court's order is supported by substantial evidence and was not an abuse of discretion.

Defendants make one other contention. That is that the trial court permitted the use of incompetent evidence and failed to rule on their objections thereto.

The main target of their objections was the testimony of one Kemmel, the secretary and assistant general counsel of Monogram. Objection was directed to his lack of personal knowledge of the operations of Modular and his recitation of facts and conclusions from Monogram and Modular documents and records.

Kemmel in two lengthy declarations revealed a detailed knowledge of the operations of both Monogram and Modular. He spent several years in close collaboration with Bishton and was privy to the decision making regarding Modular and the Magic Flush program.

All of the evidence which he furnished was fully discussed and countered in defendants' declarations. In brief, the defendants had full

opportunity to be heard on the issues. No prejudice is apparent. (See *Stanwood* v. *Carson,* 169 Cal. 640 [147 P. 562].)

In the instant case, the trial judge stated clearly that he was going to admit all the evidence and assign to it the weight it deserved. We can only assume he did what he said he was going to do. (*DeTray* v. *Higgins,* 31 Cal.App.2d 482 at pp. 487-488 [88 P.2d 241].) ■ In any event the trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts. (*Voeltz* v. *Bakery etc. Union,* 40 Cal.2d 382 [254 P.2d 553]; *Globe D. Lunch* v. *Joint Culinary Wkrs.,* 117 Cal.App.2d 190 at p. 193 [255 P.2d 94].)

With respect to the admissibility of documentary evidence, where there is any basis for the trial court's discretion in determining that a proper foundation as to authenticity has been shown we, as an appellate court, will not disturb it. (*Cole* v. *Ames,* 155 Cal.App.2d 8 at p. 18 [317 P.2d 662].)

■ Lastly mere failure to rule on evidence received subject to objection while not always a commendable practice is not prejudicial if the court finds in consonance with the evidence. (*Clopton* v. *Clopton,* 162 Cal. 27 [121 P. 720]; *Alocco* v. *Fouche,* 190 Cal.App.2d 244 [11 Cal.Rptr. 818].) It is presumed that a court sitting without a jury does not base its findings on irrelevant evidence where there is competent evidence to support it. (*Brock* v. *Fouchy,* 76 Cal.App.2d 363 [172 P.2d 945]; *Keating* v. *Basich Bros. etc. Co.,* 66 Cal.App.2d 258 [151 P.2d 892]; *So. Cal. Jockey Club* v. *Cal. etc. Racing Bd.,* 36 Cal.2d 167 at p. 176 [223 P.2d 1].)

The order is affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied January 7, 1977, and appellants' petition for a hearing by the Supreme Court was denied March 31, 1977.