Filed 3/2/16  Hakenjos Hall Prof. Services v. Bland CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| HAKENJOS HALL PROFESSIONAL SERVICES, INC., | |
| Plaintiff, | (Super. Ct. No. 37-2013-00077851-CU-BT-CTL) |
| v. | |
| KATHY BLAND et al., | |
| Defendants. | |
| | D067385 |
| HAKENJOS HALL PROFESSIONAL SERVICES, INC., et al., | |
| Plaintiffs,Cross-defendants and Respondents, | (Super. Ct. No. 37-2014-00019111-CU-BC-CTL) |
| v. | |
| KORTE/SCHWARTZ, INC., et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Judith F. Hayes, Judge. Affirmed.

Lawton Law Firm, Dan Lawton and Joseph C. Kracht for Defendants. Cross-complainants and Appellants.

Hall & Associates, Jim S. Hall; Gillaspey & Gillaspey and Steele N. Gillaspey for Plaintiffs, Cross-defendants and Respondents.

After establishing a successful accounting practice for over 30 years, Martin Schwartz sold the business, including its goodwill and extensive client list to Hakenjos Hall Professional Services, Inc. (Hakenjos Hall) for about $2 million. As part of the sale, Schwartz agreed, for 10 years, to not solicit or accept accounting work from the 3,100 clients on the customer list.

Schwartz remained with Hakenjos Hall to facilitate the transition. After two years, Schwartz left, taking some of the clients with him. Hakenjos Hall claims Schwartz stole clients it paid nearly $2 million to acquire. Schwartz contends he was merely trying to fix errors Hakenjos Hall had made for clients who were calling Schwartz in a panic about payroll tax errors and penalties.

Hakenjos Hall sued Schwartz and sought a preliminary injunction to prohibit Schwartz from soliciting or accepting work from those on the client list. The court granted the preliminary injunction, determining Schwartz "did what he contracted not to do, and so that's going to cause difficulty for Hakenjos and it's got to be solved . . . ."

Schwartz appeals the order granting the preliminary injunction. He asserts the court granted a mandatory injunction (as distinguished from a prohibitory injunction),

2

which requires close appellate scrutiny. Schwartz also contends the court abused its discretion in determining (1) Hakenjos Hall would likely prevail on the merits, and (2) the balance of hardships supported issuing the injunction. Additionally, for the first time in the reply brief, Schwartz contends the preliminary injunction is a "nullity" and void because the court did not require Hakenjos Hall to furnish a bond.

We affirm because the injunction is prohibitory, not mandatory; the court did not abuse its discretion, and the court found "defendants waived their right to require a bond." (See *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 744 ["the injunction bond requirement of [Code of Civil Procedure] section 529 can be waived or forfeited by the party to be enjoined"]).

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Introduction*

In relating the events underlying this dispute, we emphasize that no trial on the merits has occurred; therefore, many significant facts remain in dispute at this stage of the litigation. Nevertheless, in the procedural posture of the case—a motion for a preliminary injunction—the trial court was required to make certain findings, expressly or by implication, to which we defer to the extent they are supported by substantial evidence. (*Allliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1309 (*Gaddy*).) Accordingly, we view the facts in the light most favorable to the prevailing party—here, Hakenjos Hall.

B.  *Schwartz Sells the Business, Including Goodwill and Client List*

Martin Schwartz is the president of Korte/Schwartz, Inc., which does business as Martin Schwartz & Associates (Schwartz).[1]  Schwartz has been providing accounting, bookkeeping, tax preparation, sales tax and payroll tax preparation, and related services in San Diego for over 30 years.

In January 2012 Schwartz sold the business to Hakenjos Hall.  The assets sold included the business premises in La Mesa and the "assets of the business including . . . client lists . . . [and] goodwill."  Exhibit A to the purchase agreement contains a list of approximately 3,100 Schwartz clients (hereafter Exhibit A clients).

Hakenjos Hall paid Schwartz approximately $1.8 million cash, plus a promissory note secured by the business assets, in the principal amount of $259,375, requiring monthly payments of approximately $6,084 beginning February 2014.

Purchasing exclusive rights to the Exhibit A clients as part of the business goodwill was a "key" provision.  As Carl Hakenjos, Jr. stated, "The clients of the business belonged to the business, and I was buying the business."  Of the total approximate $2 million purchase price, the parties allocated $1.145 million to goodwill, $875,000 for the La Mesa real property, and $40,000 for Schwartz's covenant not to compete.

---

[1]     In their brief, appellants refer to themselves collectively as "Schwartz" and state where necessary to distinguish one appellant from another by name, they do so.   We adopt the same convention.  For clarity, we refer to Martin Schwartz as Martin, and his son, Jacob Schwartz, as Jacob.

C. *Schwartz's Covenant not to Compete*

In the purchase agreement, Schwartz agreed "[w]ith regard to the clients listed on Exhibit A" to "not engage in the practice of public accounting . . . for a period of ten (10) years from close." Schwartz further agreed to not:

> "a. Canvas, solicit, or accept any business from any clients listed on Exhibit A;
>
> "b. Give any other person, firm, partnership, or corporation the right to canvas, solicit, or accept any business for any other accounting firm from any clients listed on Exhibit A;
>
> "c. Directly or indirectly request or advise any clients listed on Exhibit A to withdraw, curtail, or cancel its business with the Buyer;
>
> "d. Directly and indirectly disclose to any other person, firm, partnership or corporation the names of clients listed on Exhibit A."

In a separate "Non-Compete Agreement," Schwartz also agreed that for 10 years he would "not perform services for any person or entity [¶] (a) who was a client of the Company at the time of the Closing; [¶] (b) who had been a client of the Company within two (2) years prior to the Closing; or [¶] (c) who was an active prospect of the Company at the time of the Closing." Schwartz agreed that for the same 10-year period, he would not "perform any accounting services for any person or entity, nor will he market or solicit to new clients, within a 25 mile radius" of the La Mesa business property.

In addition to these provisions, each party made certain representations and warranties. Hakenjos Hall represented and warranted that it "will operate the Business in a professional manner."

D. *Martin Remains for Two Years to Facilitate the Transition*

To facilitate the transition, Martin agreed to "be available, as needed, at buyer's request for assistance with transition for the first year." The purchase agreement provides this "does not constitute a partnership, nor an employment agreement, but is an agreement for seller to assist with clients during the transition agreement as needed, solely at buyer's discretion, and for reasonable compensation for seller's time required for preparation of specific returns." Hakenjos Hall asked Martin to provide such services, and he did so for over two years, until resigning in May 2014.

Carl Hakenjos explained, "The business deal was a good deal—for both Martin and me. Martin got a big chunk of money ($2,000,000), got a continuing income doing work for me without any of the ownership headaches, and got his son, Jacob, employed—amongst other things. I got what due diligence convinced me was a great business—with a long term, very loyal client base that more than established the business value. The Martin Schwartz name and client relationships over some 30 years was the business."

E. *Disputes Arise*

In May 2014 disputes arose. According to Martin, clients "were calling me in a state of panic, telling me that Hakenjos Hall was making serious mistakes on their financial documents related to payroll and bookkeeping." These mistakes were causing "payroll late fees, payroll tax penalties" and in some cases "payroll tax liens and bank account levies." Martin contends Hakenjos Hall's negligence was "rampant" and resulted in a staggering number of mistakes.

6

Martin asserts he "constantly offered to help Mr. Hakenjos fix the mistakes. However, Mr. Hakenjos rejected every offer." After continuing to receive "phone calls from clients complaining about the lack of competency and diligence of Hakenjos Hall," Martin resigned, opened a new business more than 25 miles away, and, in response to client requests, "agreed to help correct the mistakes and to right the wrongs Hakenjos Hall's negligence has caused them." Martin admits these persons were "clients of [Korte/Schwartz] for over a decade . . . ." He performed these "corrective" services at no charge and "for the sole purpose of fixing the mistakes of Hakenjos Hall." Martin denies soliciting any clients, but instead contends "[t]he clients who have left Hakenjos Hall have left because they are dissatisfied with the quality and care of services provided by Mr. Hakenjos. Said clients are calling me and asking for my help because they trust me personally and professionally."

Hakenjos Hall's version of events is completely different. A former Schwartz employee, Regina Harnois, stated, "Martin Schwartz and Jacob Schwartz discussed with me and among themselves their intention to, in their words, 'steal' all of Mr. Hakenjos' clients from him. They formed plans to contact all of their former clients by mail, telephone calls and personal visits and to solicit their business for the Schwartz' new company. They repeatedly said they intended to 'destroy' Mr. Hakenjos and his business and put him out of business by contacting their old clients, soliciting their business and inducing them to leave Mr. Hakenjos' company and come to the Schwartz' company. [¶] The Schwartzes also told me that they know all their former clients' financial secrets and

7

that they intended to use that knowledge to frighten the clients into turning their business over to the Schwartzes."

     F.  *Hakenjos Hall Sues Schwartz and Seeks a Preliminary Injunction*

In June 2014 Hakenjos Hall filed a complaint and, later that same month, a first amended complaint against Schwartz. The first amended complaint alleges Schwartz breached the noncompete provisions of the purchase agreement and the separate noncompete agreement.

In October 2014 Hakenjos Hall filed a motion for a preliminary injunction to enjoin Schwartz from providing services to the Exhibit A clients. The motion was supported by: (1) Harnois's declaration, excerpts of which are quoted above; and (2) declarations from several clients, each stating they had been a Schwartz client for many years, and that in June or July 2014, Martin solicited their business, "reminding me that he knows my business very, very well after all the years we have done business together"; and (3) Carl Hakenjos's declaration, discussed below.

Carl Hakenjos's declaration states Hakenjos Hall was losing substantial amounts of income and "is in immediate danger" of failing due to the exodus of clients to Schwartz. He identified 26 clients who told him Martin had "contacted them directly seeking their business" and had "gone with Schwartz." Hakenjos identified an additional 35 Exhibit A clients who refused to discuss the situation, but had "left my business since Martin Schwartz left, started his competing business, and began soliciting those clients of mine."

Hakenjos stated, "Martin has gotten my $2,000,000 . . . and is now obtaining . . . the monthly payments for services to the clients that I was given exclusive

8

right to as part of the contract—clients that Martin promised by contract that he would not accept or service. . . . [¶] . . . [¶] If I go under because Martin got enough of my clients, then Martin ends up with both my $2,000,000 and the business which was worth $2,000,000 when purchased."

Opposing the motion, Martin filed a declaration, which denied soliciting Exhibit A clients, but admitting accepting work from them, stating:

> "I never solicited any former or existing clients of Hakenjos Hall. Rather, it is the exact opposite. Former and existing clients of Hakenjos Hall are calling me furious and in a state of panic about the ongoing egregious mistakes Hakenjos Hall is making on their bookkeeping and payroll records and asking me to help them correct the problems. The persons calling me were clients of [Korte/Schwartz] for over a decade; persons with whom I have developed a substantial personal and professional relationship. At their request, I agreed to help correct the mistakes and to right the wrongs Hakenjos Hall's negligence has caused them. All 'corrective' services I have performed for said clients have been free of charge and for the sole purpose of fixing the mistakes of Hakenjos Hall."

Schwartz also filed 13 cookie-cutter declarations from Exhibit A clients, each stating: (1) "Hakenjos Hall made serious mistakes on my company's bookkeeping and/or payroll records"; and (2) "I called Martin Schwartz to tell him about the serious mistakes . . . [and] I asked Martin Schwartz for help and to correct the serious mistakes made by Hakenjos Hall." In a supplemental filing, Schwartz submitted 12 more similar declarations.

Jacob Schwartz also filed a declaration, denying Harnois's assertions that he and Martin conspired or planned to steal business. Schwartz's attorneys sought to impeach

9

Harnois with evidence of a prior felony conviction and her involvement in numerous other civil cases.

Significantly, although the parties disputed Schwartz's motives, there was no dispute that Schwartz accepted and performed accounting work for Exhibit A clients. Schwartz's opposition essentially hinged on a legal argument that he was *excused* from his obligations under the noncompete provisions because Hakenjos Hall *breached first*—by failing to conduct the business "in a professional manner," as required by the purchase agreement. Schwartz also asserted any duty to perform the noncompete provision was excused by Hakenjos Hall's breach in failing to make installment payments on the promissory note in June 2014 and thereafter.

G. *Temporary Restraining Order*

Pending a ruling on the motion for preliminary injunction, the court granted a temporary restraining order (TRO). The TRO enjoined and restrained Martin, Korte/Schwartz, and Jacob from "soliciting bookkeeping, accounting and/or tax preparation business from, doing [such business] for, [and] accepting any bookkeeping, accounting and/or tax preparation business from, any person listed on Exhibit A of the Purchase Contract."

H. *The Court Grants the Preliminary Injunction*

The court conducted a hearing on the motion for preliminary injunction. Although Schwartz's attorneys had impermissibly filed an oversized opposition (25 pages instead of the allowed 15), the court assured Schwartz's lawyer "we read it."[2]

At the hearing, the court stated it was inclined to grant the preliminary injunction because Schwartz admitted working for Exhibit A clients. Explaining the ruling, the court stated:

> "The problem is that your client basically admitted, perhaps for some very, very compassionate reasons, he did what he contracted not to do, and so that's going to cause difficulty for Hakenjos and it's got to be solved, but go ahead. There are lots of good CPA's around and if the clients are having a difficulty with Hakenjos, they have to go out and find somebody else."

After taking the matter under submission, on January 9, 2015, the court issued a minute order granting the motion for a preliminary injunction.[3] In the minute order, the court "limit[ed] the preliminary injunction to include conduct enumerated in the TRO of Martin Schwartz, Korte/Schwartz, and any person directly affiliated with Martin Schwartz and who is under the direction, control and authority of Martin Schwartz." The

---

[2]    A responding memorandum may not exceed 15 pages. (Cal. Rules of Court, rule 3.1113(d).)  A memorandum that exceeds the page limits will be considered in the same manner as a late-filed paper (rule 3.1113(g)), meaning the trial court has discretion to disregard the filing. (Rule 3.1300(d).)  Schwartz's lawyer explained he mistakenly confused federal rules with state rules, and the court accepted the explanation, stating, "[a]nd that's happened, so I didn't go after you too terribly."

[3]    Contrary to the court's comment at the hearing, the minute order states the court "did not consider" Schwartz's opposition because it was "25 pages long and in violation of the Rules of Court."  The parties do not explain this discrepancy.

11

court's order notes this limitation "is meant to remedy defendant Jacob Schwartz' concerns that he be able to practice his profession freely as long as he obtains independent employment unfettered by his father's direction, control or authority." The minute order states, "Plaintiff is directed to submit a proposed order for preliminary injunction in accordance with the Court's ruling herein."

On January 28, 2015, Schwartz appealed from the January 9, 2015 order granting the preliminary injunction. For reasons the parties do not explain, the court did not enter a separate order granting the preliminary injunction until March 20, 2015. The order entered March 20, 2015 states in part: "Martin Schwartz, Korte/Schwartz and all persons or entities acting in concert with them . . . are ENJOINED and RESTRAINED from soliciting bookkeeping, payroll, accounting . . . and/or accepting any bookkeeping, payroll, accounting . . . from any person listed on Exhibit A of the Purchase Contract . . . ."[4]

## DISCUSSION

### I. *APPEALABILITY*

Schwartz's brief correctly states that an order granting a preliminary injunction is an appealable order. (Code Civ. Proc., § 904.1, subdivision (a)(6); *NewLife Sciences, LLC v. Weinstock* (2011) 197 Cal.App.4th 676, 686.) However, in this case, there are two orders granting the preliminary injunction. Schwartz appealed from the January 9,

---

[4] Consistent with the court's statement at the hearing, this order states, "[Schwartz's] Opposition Papers . . . were 25 pages long and in violation of the Rules of Court. . . . While the court was inclined to not consider the Schwartz opposition papers, as it is entitled to do, the Court nevertheless did consider [them]."

2015 minute order, but did not file a notice of appeal from the March 20, 2015 written order.

The parties do not discuss which of the two orders (or both) are appealable, or whether the notice of appeal filed January 28, 2015, could effectively appeal from the written order entered almost two months later. Although the parties have not raised these issues, we have an independent obligation to raise and address issues of appealability. (*Judge v. Nijar Realty, Inc.* (2014) 232 Cal.App.4th 619, 629.)

The January 9, 2015 minute order granting the preliminary injunction was not appealable because it expressly required a written order to be prepared. (Cal. Rules of Court, rule 8.104(c)(2) ["if the minute order directs that a written order be prepared, the entry date is the date the signed order is filed"]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) ¶ 3:50, p. 3-24 ["if the order is entered in the minutes and the minute order expressly directs that a written order be prepared, signed, and filed, the order is 'entered' on the date the signed order is filed," italics omitted].)

However, the written order granting the preliminary injunction, filed March 20, 2015, is appealable. (Code Civ. Proc., § 904.1, subdivision (a)(6).)

Thus, Schwartz filed a notice of appeal from the nonappealable minute order and failed to file a notice of appeal from the appealable formal order. Nevertheless, the notice of appeal filed on January 28, 2015, is effective to appeal from the March 20, 2015 order. The notice of appeal was premature, but is deemed effective as of the date the formal order was entered because the notice of appeal was filed after the court rendered

its decision.  (Rule 8.104(d)(1); *In re Marriage of Zimmerman* (2010) 183 Cal.App.4th 900, 906 [notice of appeal filed after minute order but before entry of signed order treated as filed immediately after entry of signed written order].)  Moreover, a notice of appeal is liberally construed to protect the right of appeal if it is reasonably clear what appellant was trying to appeal from, and so long as the respondent could not possibly have been misled or prejudiced.  (*Luz v. Lopes* (1960) 55 Cal.2d 54, 59; *D'Avola v. Anderson* (1996) 47 Cal.App.4th 358, 361.)  Here, Schwartz was attempting to appeal from the order granting the preliminary injunction, and Hakenjos Hall could not possibly have been misled or prejudiced by a purported appeal from the January 9, 2015 minute order rather than the March 20, 2015 order containing the same injunctive relief.

## II.  *THE INJUNCTION IS PROHIBITORY, NOT MANDATORY*

An injunction may be either mandatory or prohibitory.  A prohibitory injunction is "a writ or order requiring a person to refrain from a particular act."  (Code Civ. Proc., § 525.)  A mandatory injunction requires a person to take affirmative action that changes the parties' position.  (See, e.g., *Warsaw v. Chicago Metallic Ceilings*, *Inc.* (1984) 35 Cal.3d 564, 572 [injunction requiring removal of structure].)

The distinction between a mandatory and prohibitory injunction impacts the standard of review.  Where the injunction is mandatory, it changes the status quo, and therefore is scrutinized ""more closely"" for abuse of discretion.  (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1047-1048.)  "The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts. A preliminary

14

mandatory injunction is rarely granted, and is subject to stricter review on appeal.'" (*Id.* at p. 1048.)

Schwartz contends the injunction here is mandatory because it compelled Schwartz to "take action changing the status quo (i.e., stop serving clients all parties agree he had been serving before the order issued.)" As explained below, Schwartz's assertion is incorrect because he misapprehends what "status quo" means in this context.

In the context of injunctions, the status quo is "'the last actual peaceable, uncontested status which preceded the pending controversy.'" (*United Railroads v. Superior Court* (1916) 172 Cal. 80, 87 (*United Railroads*); see *Agricultural Labor Relations Bd. v. Tex-Cal Land Management, Inc.* (1985) 165 Cal.App.3d 429, 440 (*Tex-Cal Land*.) Here, the status quo—the last peaceable, uncontested status of the parties which preceded the controversy— is a state of affairs where Schwartz was *not* performing bookkeeping or accounting services for the Exhibit A clients.

The injunction compels a return to the status quo by prohibiting Schwartz from performing accounting and bookkeeping services for Exhibit A clients. Therefore, the injunction is prohibitory. "An injunction designed to preserve the status quo as between the parties and to restrain illegal conduct is prohibitory, not mandatory . . . ." (*Oiye v. Fox*, *supra,* 211 Cal.App.4th at p. 1048.)

The status quo is not, as Schwartz argues, simply any situation existing before the filing of the lawsuit. The status quo is not a state of affairs where Schwartz is violating the noncompete provisions. Rather, the status quo is the last "'*peaceable*, *uncontested* status'" before the dispute arose. (*United Railroads*, *supra*, 172 Cal. at p. 87.) Here, the

15

injunction returns the parties to, and restores, the status quo; therefore, it is a prohibitory injunction.

To comply with the order, Schwartz has to stop current work for the Exhibit A clients, in addition to not accepting such work pending the outcome of the trial. But having to stop current work for Exhibit A clients does not change the character of the injunction. If this were not so, almost any injunction against the doing of repeated acts would be mandatory if the performance of the acts had begun. (*Jaynes v. Weickman* (1921) 51 Cal.App. 696, 701-702.) The injunction does not compel Schwartz to do any affirmative act, but merely prohibits him from doing the very things he agreed under his contract with Hakenjos Hall not to do. It is therefore a prohibitory injunction.

Citing *Feinberg v. One Doe Co.* (1939) 14 Cal.2d 24 (*Feinberg*), Schwartz contends an injunction ordering a person to stop doing something he is already doing is always and necessarily a mandatory injunction. In *Feinberg*, the court entered an order compelling the defendant to discharge an employee because she was not a union member. The Supreme Court held the injunction was mandatory because it "compell[ed] affirmative action on the part of the defendants." (*Id.* at p. 27.)

However, in *Feinberg,* the court carefully limited its holding to the facts presented in that case, namely, an injunction compelling the defendant to discharge a single employee. (*Feinberg, supra,* 14 Cal.2d at pp. 27-28.) The *Feinberg* court stated, "in view of the fact that the order appealed from was directed solely to this issue, no contention may be legitimately made that the order although mandatory was only

16

ancillary to or subsidiary to another or main order which was prohibitive . . . ."  (*Id.* at p. 28.)[5]

In contrast to the situation in *Feinberg*, other types of injunctions, such as the one at issue here, are prohibitory even if they have incidental mandatory features.  For example, in *United Railroads,* the plaintiff street railway company obtained a preliminary injunction against defendant city, prohibiting the city from using plaintiff's tracks.  The city contended the injunction was mandatory because it compelled the city to surrender an existing right to use the tracks.  The Supreme Court disagreed, stating the fact that the defendant had been enjoying its asserted right to use the tracks, and must now stop, does not change the fundamental nature of the order, which was a prohibition on using the tracks.  (*United Railroads, supra,* 172 Cal. at pp. 88, 91.)

Similarly, in *Jaynes v. Weickman*, *supra*, 51 Cal.App. 696, defendants, who were enjoined from using a trade name, contended the injunction was mandatory because it compelled them to stop an existing use, and remove the name from their trucks, business, and advertising.  The court rejected that argument, and held the injunction was prohibitory, stating:  "An order or decree restraining the further continuance of an existing condition does not take on the character of a mandatory injunction merely

---

5       *Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618 (*Shoemaker*), which Schwartz cites for a similar proposition, also involved a single employee—in that case, a physician, who was removed from a certain administrative position with a university and a county medical center.  The injunction was mandatory because it ordered defendants to take affirmative steps to restore the physician to his former position.  As in *Feinberg*, the order in *Shoemaker*, which pertained to one person, could not be viewed as ancillary to a main order that was prohibitive in other respects.

17

because it enjoins the defendants from continuing to do the forbidden acts." (*Id.* at p. 699.) The *Jaynes* court added, "the affirmative acts necessary to be done by defendants in order to continue the transaction of their business without disobeying the injunctive features of the judgment are but acts that are necessary to effectuate the principal purpose of the injunction, which is to forbid further infringement upon plaintiff's right to the exclusive use of the business name that she had adopted before the defendants entered the field of competition. The injunctive parts of the decree, therefore, only *incidentally* involve the doing of any affirmative act." (*Id.* at p. 700.)

Similarly here, to the extent the preliminary injunction compels Schwartz to stop serving Exhibit A clients, it simply effectuates the principal purpose of the injunction, which is to forbid further infringement upon Hakenjos Hall's right to perform work for Exhibit A clients exclusive of Schwartz. Because any mandatory component of the injunction is incidental to its overall prohibitory character, the injunction is properly considered to be prohibitory. (*People v. Mobile Magic Sales, Inc.* (1979) 96 Cal.App.3d 1, 13 [injunction requiring mobile homes to be removed from mobile home park is "incidental" to the injunction's objective to restrain further violations and therefore is prohibitive in character]; *People ex rel. Brown v. iMergent, Inc.* (2009) 170 Cal.App.4th 333, 342 [injunction prohibiting defendants from selling products and services without required statutory disclosures is prohibitory—"any aspects of the injunctions that require defendants to engage in affirmative conduct are merely incidental to the injunction's objective to prohibit defendants from further violating" the law].)

18

Having determined the injunction is prohibitory, the rule requiring courts to give greater scrutiny to mandatory injunctions is not implicated.

### III. *PRINCIPLES OF PRELIMINARY INJUNCTIVE RELIEF AND STANDARD OF REVIEW*

"'"[T]he decision to grant a preliminary injunction rests in the sound discretion of the trial court."'" (*People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 629 (*Stender*).) "'"A trial court will be found to have abused its discretion only when it has '"exceeded the bounds of reason or contravened the uncontradicted evidence."'" [Citation.] "Further, the burden rests with the party challenging the [trial court's ruling on the application for an] injunction to make a clear showing of an abuse of discretion."'" (*Id.* at pp. 629-630.)

Courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. "'"The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued."'" (*Stender, supra*, 212 Cal.App.4th at p. 630.) The latter factor "'involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo.'" (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1402 (*Moorpark*).)

"'An appeal from an order granting a preliminary injunction involves a limited review of these two factors—likelihood of success on the merits and interim harm. If the

19

trial court abused its discretion on either factor, we must reverse.'" (*Stender*, *supra*, 212 Cal.App.4th at p. 630.)  "On appeal, we do not reweigh conflicting evidence or assess the credibility of witnesses; we only determine whether, interpreting the facts in the light most favorable to the prevailing party and indulging all reasonable inferences in favor of the trial court's order, the trial court's factual findings are supported by substantial evidence." (*Ibid.*)  "Where the evidence for and against an injunction is conflicting, we do not reweigh it but merely determine whether substantial evidence supports the trial court's determination." (*Gaddy*, *supra,* 159 Cal.App.4th at p. 1309.)  Where an issue is resolved upon declarations, "[those declarations] favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom." (*Brunzell Const. Co. v. Harrah's Club* (1967) 253 Cal.App.2d 764, 773.)

Where, as here, the trial court did not make express findings, the appellate court will presume the trial court made appropriate factual findings and review the record for substantial evidence to support the ruling.  (*Moorpark*, *supra,* 63 Cal.App.4th at p. 1402.)

## IV.  *THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN GRANTING THE PRELIMINARY INJUNCTION*

### A.  *A Covenant Not to Compete Is Enforceable in Sale of Business Assets*

"California's public policy affirms a person's right to pursue the lawful occupation of his or her choice."  (*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th

1068, 1072 (*Strategix*).)  However, as provided in Business and Professions Code[6] section 16601, "[c]ourts will enforce a noncompetition covenant . . . if the parties entered into it as part of the sale of a business."  (*Strategix*, at p. 1072.)  Section 16601 provides in part, "Any person who sells the goodwill of a business . . . may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold . . . has been carried on, so long as the buyer . . . carries on a like business therein."  This exception in section 16601 serves an important commercial purpose by protecting the value of the business acquired by the buyer.  "The thrust of . . . section 16601 is to permit the purchaser of a business to protect himself . . . against competition from the seller which competition would have the effect of reducing the value of the property right that was acquired." (*Monogram Industries, Inc. v. Star Industries, Inc.* (1976) 64 Cal.App.3d 692, 701.)

"[C]ourts may enforce nonsolicitation covenants barring the seller from soliciting the sold business's . . . customers." (*Strategix, supra,* 142 Cal.App.4th at p. 1073, italics omitted.)  "A covenant not to solicit the sold business's . . . customers prevents the seller from eroding the very goodwill it sold, while allowing the seller otherwise to pursue its chosen business with whatever  . . . customers it can attract." (*Ibid.*)

---

6    All further statutory references are to the Business and Professions Code unless otherwise specified.

B. *The Court Did Not Abuse Its Discretion in Determining Hakenjos Hall Would Likely Prevail on the Merits*

The court did not abuse its discretion in determining Hakenjos Hall would likely succeed on the merits. Under the purchase agreement, Schwartz promised to not "canvas, solicit, or accept any business from any clients listed on Exhibit A." However, declarations Schwartz himself submitted establish Schwartz did "accept" accounting business from many such clients. Schwartz's own declaration admits he performed such work.

Schwartz contends he performed work for these clients only because they sought him out "in panic" to fix Hakenjos Hall's errors. He states he performed the work for free, out of a sense of loyalty to his longtime clients. But even if true, Schwartz's good motives are, on this issue, irrelevant. The law generally does not distinguish between good and bad motives for breaching a contract. (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 182.) As the trial court aptly noted, there are thousands of qualified accountants in San Diego County, "and if the clients are having a difficulty with Hakenjos, they have to go out and find somebody else."

Moreover, there is substantial evidence Schwartz did not merely accept business to help fix problems; rather, several clients signed declarations stating Schwartz actively solicited their accounting business. One such declaration states:

> "Martin told me that he had started a new bookkeeping business and asked me to switch . . . . Martin reminded me of how long he had done [our] books, and that he really knew the business and its

22

history.  Martin said he could do the best job . . . and we should stay with him and go over to his new place."

Another declaration states Jacob Schwartz "came by our restaurant and picked up the books as usual" along with a check to pay for the work, without disclosing that Schwartz had left Hakenjos Hall and started a new business.

These declarations are consistent with portions of the declaration of Regina Harnois, a former Schwartz employee, who stated, "The Schwartzes also told me that they know all their former clients' financial secrets and that they intended to use that knowledge to frighten the clients into turning their business over to the Schwartzes. . . . [¶] I observed many of Hakenjos' clients the Schwartzes affirmatively solicited come to the Schwartz' company and they were serviced by that company."  And, as noted, Harnois also stated "Martin Schwartz and Jacob Schwartz discussed with me and among themselves their intention to, in their words, 'steal' all of Mr. Hakenjos' clients from him."

Although Schwartz contends Hanois is lying, the trial court was not required to accept Schwartz's version of events or his assessment of witness credibility.  Where the evidence for and against an injunction is conflicting, we do not reweigh it but merely determine whether substantial evidence supports the trial court's determination.  (*Gaddy, supra,* 159 Cal.App.4th at p. 1309.)

Nevertheless, Schwartz contends the court abused its discretion, and was compelled to conclude *he* would likely win on the merits.  Schwartz points to Hakenjos Hall's promise to operate the business "in a professional manner," and contends there was "unrebutted" evidence Hakenjos Hall breached this provision.  Schwartz therefore

23

contends Hakenjos Hall committed the *first* material breach of the purchase agreement, thereby relieving Schwartz of his own contractual duty to abide by the noncompete provisions.

The trial court did not abuse its discretion by rejecting this argument. The law distinguishes between material and nonmaterial breaches of contract. In contract law, only a material breach excuses further performance by the innocent party. (See generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 813, p. 906.) Whether a breach is material is generally a question of fact. (*Porter v. Arthur Murray, Inc.* (1967) 249 Cal.App.2d 410, 421-422.) The determination of the materiality of the breach often depends upon the intent of the parties as well as the particular circumstances of the case. (*Id.* at p. 422.)

Here, Hakenjos Hall's fundamental contractual obligation to Schwartz was to pay him approximately $2 million. The trial court could reasonably conclude that any failure by Hakenjos Hall to operate the business in a professional manner as to *Hakenjos Hall clients* is not a material breach *as to Schwartz.* According to the purchase agreement, once Schwartz sold the business, he was neither an employee nor a partner of Hakenjos Hall. Not surprisingly, Schwartz cites nothing suggesting he would have any personal liability for Hakenjos Hall's errors or omissions.

Schwartz contends Hakenjos Hall's failure to run the business in a professional manner "is a failure of consideration, which undermines any chance he [Hakenjos Hall] might have of prevailing on the merits of his claim at trial." In his reply brief, Schwartz

asserts such negligence by Hakenjos Hall makes it "impossible" for Hakenjos Hall to prevail on the merits.

However, Schwartz's argument ignores the nearly $2 million Hakenjos Hall has already paid for the rights to the Exhibit A clients, as well as Harnois's declaration that Martin and Jacob planned, and began to implement, a scheme to steal the business back. Ultimately, the trier of fact will have to decide if any failure by Hakenjos Hall to render professional services to its own clients is a material breach of the parties' agreement. For purposes of ruling on the motion for preliminary injunction, given the undisputed fact that Hakenjos Hall already paid Schwartz nearly $2 million cash for the Exhibit A clients, the trial court acted well within its discretion in determining that on balance, Hakenjos Hall is likely to prevail on the merits. (*Gaddy*, *supra*, 159 Cal.App.4th at pp. 1309-1310 [in an appeal from an order granting a preliminary injunction barring soliciting clients, rejecting an argument that defendant's performance was excused by a breach of contract by plaintiffs].)

In a related argument, Schwartz contends Hakenjos Hall committed the first material breach by defaulting on the $259,000 promissory note. Schwartz contends this is a material breach, relieving him of his obligations under the noncompete provisions. In his reply brief, Schwartz argues, "No reasonable person would view failing to pay ninety percent (90%) of a debt as 'not substantial or material.'"

Schwartz again overstates the merits of his own case. The total monetary consideration due under the purchase agreement was $2.175 million. Hakenjos Hall paid Schwartz approximately $1.8 cash at closing, and was obligated under a promissory note

25

to pay an additional $259,375. Contrary to Schwartz's assertion that Hakenjos Hall still owed 90 percent, actually Hakenjos Hall already paid approximately 88 percent of the total amount.

In a transaction where Hakenjos Hall paid approximately $1.8 million cash, the court could reasonably conclude a failure to make these installment payments (representing approximately 12 percent of the total monetary consideration) is not a material breach that would relieve Schwartz of his obligation to perform the noncompete provisions. Significantly, the parties themselves valued the business goodwill and noncompete covenant at $1.185 million. When the dispute arose, Hakenjos Hall had already paid well in excess of that sum.

Moreover, Schwartz concedes that Hakenjos Hall made the required installment payments beginning in February 2014 and continued making installment payments through June 2014. Hakenjos Hall stopped making installment payments *after* Schwartz violated the noncompete provisions in May 2014. Carl Hakenjos' declaration states, "That money [the $250,000 promissory note] is presently in dispute due to Martin being in breach of the business raiding provision of the contract between us." Under the circumstances here, it was not an abuse of discretion for the court to determine Hakenjos Hall's failure to make installment payments is not a material breach relieving Schwartz of its obligations under the noncompete provisions of the parties' agreements.

C. *The Trial Court Did Not Abuse Its Discretion in Balancing the Hardships*

Schwartz contends the court abused its discretion in determining the balance of hardships supports injunctive relief. He argues: (1) there is no irreparable harm because

26

money damages afford an adequate remedy, and (2) preventing Schwartz from performing work for Exhibit A clients will only harm Schwartz and not benefit Hakenjos.

The court did not abuse its discretion in determining Hakenjos Hall would suffer irreparable harm absent injunctive relief. The loss of goodwill and clients is an unquantifiable loss because it is difficult to know how many Exhibit A clients Schwartz might be able to solicit in competition with Hakenjos Hall. Moreover, it is also difficult to estimate what additional services Hakenjos Hall would have been called upon to provide had the client stayed, or to know how long a departed client might have stayed with and generated profits for Hakenjos Hall.

On similar facts, courts have granted preliminary injunctions to enforce noncompete provisions. (See, e.g., *Ragsdale v. Nagle* (1895) 106 Cal. 332 [affirming injunction enforcing noncompete provisions in sale of business with its goodwill]; *Newlife Sciences, LLC v. Weinstock* (2011) 197 Cal.App.4th 676 [affirming order granting preliminary injunction to enforce noncompete clause]; *Greenly v. Cooper* (1978) 77 Cal.App.3d 382 [affirming order granting preliminary injunction prohibiting soliciting customers on client list]; *Gaddy, supra,* 159 Cal.App.4th 1292 [affirming order granting preliminary injunction to enforce noncompete provision]; *Monogram Industries, Inc. v. SAR Industries, Inc.*, *supra,* 64 Cal.App.3d 692 [affirming order granting preliminary injunction to enforce covenant not to compete in connection with sale of business]; *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400 [affirming order granting preliminary injunction restraining use of customer list].)

27

In determining whether to grant a preliminary injunction, the court is required to assess the interim harm that the plaintiff is likely to sustain if the injunction were denied, as compared to the harm the defendant is likely to suffer if the preliminary injunction is granted. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69-70.)

Schwartz contends the balance of hardships is in his favor because "without an injunction, the status quo remains. . . . Both parties will remain in the same position they were in before the injunction was granted, and the underlying lawsuit will proceed." Schwartz's argument is flawed because he misapprehends the term "status quo." The status quo refers to the last *peaceable* status, *before* the controversy arose. The status quo here is one where Schwartz is *not* performing work for Exhibit A clients. (*United Railroads*, *supra*, 172 Cal. at p. 87; *Tex-Cal Land*, *supra*, 165 Cal.App.3d at p. 440 ["'"The status quo has been defined as the last uncontested status which preceded the pending controversy."'"].)

Moreover, the trial court could reasonably determine that restricting Schwartz from performing work for Exhibit A clients will result in minimal injury to Schwartz. Schwartz already received a material benefit of the agreement—nearly $2 million cash. Schwartz will still be able to earn a living; he may continue to solicit and perform work for anyone other than the approximately 3,100 clients on the Exhibit A list.

In contrast, there is substantial evidence supporting a finding that Hakenjos Hall's business would be substantially damaged absent injunctive relief. Carl Hakenjos's declaration states, "The business has taken, and continues to take, severe hits. I continue to lose clients from the acts of Martin Schwartz. I do not know how much longer I can

28

sustain the continuing attacks and losses.  My business is in immediate danger.

[¶] . . . The most damnable thing about this matter is that Martin has gotten my

$2,000,000.  Now he is taking the key property I paid him the $2,000,000 for, and is now

obtaining money that he is not entitled to—the monthly payments for services to the

clients that I was given exclusive right to as part of the contract—clients that Martin

promised by contract that he would not accept or service."

Citing *Shoemaker, supra,* 37 Cal.App.4th 618, Schwartz contends the court abused

its discretion in determining the balance of equities favored Hakenjos Hall.  In

*Shoemaker* a physician was removed from the administrative positions he held with a

private university medical program and with the Los Angeles County Medical Center.

Earlier, the physician had been appointed as chairperson of the university's department of

emergency medicine, and the chief of the medical center's emergency medical services

department.  (*Id.* at p. 622.)  However, two years later he was removed as unqualified in

emergency medicine.  The physician sought a preliminary injunction, ordering defendants

to refrain from replacing him as chairperson of the department of emergency medicine

and chief of the medical center's emergency medicine services department.  (*Id.* at p.

624.)

The trial court in *Shoemaker* granted the preliminary injunction; however, the

appellate court reversed.  In evaluating interim harm the Court of Appeal noted that if the

injunction were granted, "the injunction will jeopardize the accreditation of the residency

program in emergency medicine."  (*Shoemaker, supra,* 37 Cal.App.4th at p. 634.)

Moreover, "if an injunction is issued, the residency program will be put in jeopardy, and

29

the health of the community put at risk. The injury facing Shoemaker in the absence of an injunction pales in comparison to the injury that the injunction would impose on the defendants and the public." (*Ibid.*)

As is readily apparent, the facts in *Shoemaker* are significantly different from those here. Enjoining Schwartz from soliciting and accepting accounting work from Exhibit A clients poses no threat of injury to public health or welfare. It merely enforces a promise that Schwartz voluntarily made and received over $1 million cash as consideration for the sale of goodwill and promise not to compete.

In sum, we find no abuse of discretion in the superior court's decision to grant the preliminary injunction in this case. It may be that the merits ultimately favor Schwartz; however, at this stage, the court properly exercised its discretion in determining it was important to preserve the status quo, particularly since a contrary ruling could reasonably result in the failure of Hakenjos Hall's business, and Schwartz has already received approximately 88 percent of the monetary consideration in the bargain.

## V. *SCHWARTZ HAS FORFEITED THE ISSUE OF WHETHER THE COURT ERRED IN NOT REQURING A BOND*

Code of Civil Procedure section 529 provides in part: "On granting an injunction, the court or judge must require an undertaking on the part of the applicant . . . ."

On page 24 of his 25-page opposition to the motion for preliminary injunction, Schwartz asked the court to require a bond of "at least $2.5 million." In reply, Hakenjos Hall asserted, "Schwartz's inability to service clients he is already prohibited from

servicing is not compensable. Accordingly, the bond in this case should be for the minimum required by law."

At the hearing, the subject of a bond was not raised by the parties or the court. Both the minute order, and the subsequent formal order, are silent as to any bond.

For the first time in his reply brief, Schwartz contends the court's failure to order a bond renders the injunction a "nullity." Schwartz concedes his failure to raise this issue in his opening brief would ordinarily result in this issue being deemed waived or forfeited. However, citing *Fortenbury v. Superior Court* (1940) 16 Cal.2d 405, *ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1 (*ABBA Rubber*), and *Condor Enterprises, Ltd. v. Valley View State Bank* (1994) 25 Cal.App.4th 734 (*Condor*), Schwartz contends the court's failure to require a bond is a "jurisdictional defect" that cannot be waived.

Schwartz's argument is without merit. His reliance on *Fortenbury v. Superior Court, supra,* 16 Cal.2d 405 is misplaced because *Fortenbury* does not involve the effects, if any, of not requiring a bond under Code of Civil Procedure section 529. The issue in *Fortenbury* was whether the trial court had jurisdiction to enjoin certain picketing during a labor dispute. "Decisions are not controlling authority for propositions not considered in the case." (*Natkin v. California Unemployment Ins. Appeals Bd.* (2013) 219 Cal.App.4th 997, 1007.)

Moreover, Schwartz's brief fails to cite authority that contradicts his argument, *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729 (*Smith*). The court in *Smith* distinguished the cases Schwartz relies on and, contrary to Schwartz's assertions,

31

held "the injunction bond requirement of section 529 can be waived or forfeited by the party to be enjoined." (*Smith,* at p. 744.) The appellate court in *Smith* explained that the reference to the failure to require a bond as a "jurisdictional defect" in *Condor* (*supra,* 25 Cal.App.4th at p. 741) "is best suited to situations involving the court's authority in subsequent matters, such as those involving contempt proceedings or sanctions." (*Smith*, p. 743, fn. 11.)

Rejecting an argument like Schwartz makes here, the Court of Appeal in *Smith* held, "*Condor*[*, supra,* 25 Cal.App.4th 734,] and *ABBA Rubber*[*, supra,* 235 Cal.App.3d 1,] did not involve findings of fact by the trial courts that the injunction bond requirement had been waived or forfeited by the party to be enjoined." (*Smith, supra,* 182 Cal.App.4th at p. 742.) The *Smith* court further held that "*ABBA Rubber* does not stand for the proposition that a party may never waive the injunction bond requirement of section 529." (*Smith*, at p. 744.)

Here, in addition to not citing *Smith*, Schwartz has also failed to acknowledge the court entered a minute order expressly finding he waived the bond requirement in the trial court. On March 11, 2015, the court entered a minute order stating, among other things: "The Court finds defendants waived their right to require a bond in the ruling on the preliminary injunction." Schwartz's brief does not mention this finding, much less challenge it.

Accordingly, Schwartz has forfeited the bond issue on appeal. Under *Smith,* the bond requirement of section 529 is not jurisdictional and "can be waived or forfeited by the party to be enjoined." (*Smith, supra,* 182 Cal.App.4th at p. 744.) Schwartz forfeited

32

this issue by not raising it in his opening brief. "'Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.'" (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1064, fn. 2.)

Moreover, Schwartz has also forfeited the issue by not contesting the court's finding that he waived a bond. In a minute order entered nine days before the court's formal order granting the preliminary injunction, the court determined Schwartz waived the bond requirement. Schwartz's briefs do not challenge this finding; in fact, they do not mention it. A reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) "A fundamental principle of appellate law is the judgment or order of the lower court is presumed correct and the appellant must affirmatively show error by an adequate record." (*Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1178.) As the party with the burden to show error, Schwartz must establish no substantial evidence supports the court's finding that he waived the bond requirement. He made no effort to do so. Therefore, the court's finding of waiver must be affirmed.

DISPOSITION

The order is affirmed.  Hakenjos Hall to recover costs on appeal.


NARES, Acting P. J.

WE CONCUR:


McINTYRE, J.


IRION, J.